THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GEORGE TIMMONS, JR., Defendant-Appellant.

First District (2nd Division)    No. 83—1044

Opinion filed September 18, 1984.

James J. Doherty, Public Defender, of Chicago (Frank P. Madea, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, David A. Cuomo, and John L. Malevitis, Assistant State's Attorneys, of counsel), for the People.

JUSTICE PERLIN delivered the opinion of the court:

Defendant George Timmons, Jr. (Timmons), was charged with two counts of murder (Ill. Rev. Stat. 1981, ch. 38, par. 9—1) and two counts of armed violence (Ill. Rev. Stat. 1981, ch. 38, par. 33A—1). Prior to trial in the circuit court of Cook County, the State nol-prossed the two counts of armed violence. At defendant's request, the jury also received verdict forms for voluntary manslaughter (Ill. Rev. Stat. 1981, ch. 38, par. 9—2). Thereupon, Timmons was found guilty of two counts of voluntary manslaughter. On March 30, 1983, Timmons was sentenced to two consecutive 25-year extended terms.

Timmons appeals, presenting the following issues for review: (1) whether the trial court erred in granting the State's motion *in limine* to exclude the nonverbal statements of one of the victims; (2) whether the jury was properly instructed with regard to the use of defendant's prior conviction; (3) whether the trial court erred in imposing extended and consecutive term sentences; and (4) whether the State's use of peremptory challenges deprived defendant of a fair trial.

For the reasons hereinafter set forth, we affirm defendant's convictions for voluntary manslaughter and modify the sentences im-

posed by the trial court.

At pretrial proceedings, the State filed a motion *in limine* to exclude from evidence nonverbal statements allegedly made by a victim, John Brooks. At the hearing on this motion, Terry Brooks, the victim's brother, testified that he and his mother visited John in intensive care at St. Anne's Hospital in Chicago on January 10, 1982, at approximately 9 p.m., some 19 hours after the shooting. During this visit, Terry asked his brother if his shooting was "accidental." John responded by "nodd[ing] his head up and down indicating yes." When Terry asked him if the shooting was "intentional," John "shook his head no." John was on a respirator, had tubing in his throat to assist him in breathing and appeared to be "drugged." John went into a coma on the morning of January 11, and so remained until his death on January 16.

Dr. Reginaldo Picache, a surgeon, testified: On January 10, 1982, at approximately 4 a.m., he performed surgery on John Brooks at St. Anne's Hospital. He observed that the patient's carotid artery and jugular vein were severed beyond repair, and he "ligated" both of these "vessels" to prevent continual bleeding. There was also a hole in the trachea which rendered John Brooks unable to speak. It was Picache's medical opinion that Brooks' "mental faculties were impaired from the time of the shooting to the time of death." Dr. Picache at no time indicated to Brooks his physical condition because "[Brooks] was not alert enough to understand." Following surgery, Dr. Picache monitored Brooks by communicating with nurses in attendance, and he based his opinion of John Brooks' condition on the nurses' "telephonic communications." Brooks was examined by a neurosurgeon on January 11, who found Brooks to be "unresponsive" because of swelling of his brain.

Patricia King, a critical care nurse at St. Anne's Hospital, testified that she "treated" John Brooks in the intensive care unit on January 10 and 11 following his surgery. Brooks, according to nurse King, was able to squeeze her hand with his right hand and to move his right leg, but his left side was paralyzed. Although King stated that Brooks responded to "certain commands by gesture," "he had a tube down his throat" and "was unable to talk." At some time on January 11, Brooks "became unresponsive to any kind of verbal, tactile, painful stimuli."

Luretha Brooks, mother of John and Terry Brooks, testified that on January 10, at approximately 9:30 p.m., she and her son, Terry, visited John in the intensive care room at St. Anne's Hospital. When Terry asked John if the shooting was accidental, he "nodded" his

head yes; when Terry asked his brother if the shooting was intentional, "he shook his head no." The parties then stipulated that Luretha's testimony would be the same as that of her son Terry.

Defendant's counsel argued that John Brooks' nonverbal responses were dying declarations and therefore admissible as an exception to hearsay evidence.

The trial court granted the State's motion *in limine* to exclude John Brooks' nonverbal responses, finding that "John Brooks did make a nonverbal response, assertion to his brother ***"; that "there was a mortal wound inflicted on him"; and that "the nonverbal assertion does not fit within any of the recognized exceptions to the hearsay rule and is not admissible as a dying declaration ***" because the nonverbal responses made by Brooks were "conclusionary."

At trial, Janeen Smith, a friend of Timmons, testified to the following: On January 9, at approximately 8:30 p.m., she arrived at the home of Desmona Timmons, defendant's sister, located at 4749 West Adams, Chicago, where a surprise birthday party was being held for Timmons. Desmona and Etheral Green were already present. Later that evening, Timmons arrived with John Brooks, Barbara Watson and Diane Perry. At approximately 2 a.m. on January 10, Janeen heard Timmons and Victor Rainey "arguing." She saw George Timmons (defendant's father), John Brooks and Etheral Green "trying to stop George Jr. from going downstairs." Defendant, Brooks and Green, however, went down the stairs. Several minutes later Janeen "heard a shot" and she ran down the stairs. Timmons was standing on the steps, approximately five or six feet "above" Green, holding a gun in his hand. Janeen heard Green tell Timmons "to calm down and don't go upstairs after Victor." Timmons told Green "to get out of the way." Green then told Timmons, "If you want to shoot somebody so bad, Man, shoot me." Timmons thereupon shot Green in the head. Janeen ran to the first floor apartment to get towels and attempted to revive Green, but "he was dead." At this time, Diane Perry ran down the stairs to Janeen and said, "Oh, my God, [John Brooks has] been shot too." Janeen saw John Brooks lying on the steps leading up to the second floor. "Everybody had been drinking" at the party and "everybody was a little high."

Robert Doss, who also attended Timmons' surprise party, testified to the following: On January 10, shortly before 2 a.m., he heard "Victor [Rainey] call Timmons a punk." Despite the fact that "all the men were trying to stop him [Timmons] from leaving the apartment," Timmons left. John Brooks and Green "went after him." Desmona and Janeen also left the apartment. Doss "heard some screaming, some

shooting and after that [Timmons] came up into the apartment," holding a gun, and said "I have a couple of bullets left." Timmons went into the "back" area of the apartment and shortly thereafter left the apartment.

Arthur Hajek, a Chicago police officer, testified: On January 10, at approximately 4:30 a.m., he was assigned to investigate a shooting at 4749 West Adams. Hajek searched inside the hallway for weapons, expended cartridge cases, expended bullets and bullet holes but found none. Hajek performed no search outside the building.

Dr. Uetil Choi, Cook County assistant medical examiner, testified: He performed autopsies on John Brooks and Etheral Green. Dr. Choi removed a bullet from Green's body and stated that Green was shot from a distance of at least two feet. Dr. Choi did not retrieve a bullet from Brooks' body.

Ralph Vucko, a Chicago police detective, testified: On January 10, at approximately 3:55 a.m., he was assigned "To investigate two people shot at 4749 West on Adams." In his investigation, he apparently discovered no evidence except that he found blood "around the area of Etheral Green on the midlanding between the first and second floor." On January 10, at about 7 a.m., when Timmons surrendered himself at the Fourth Area police station, Vucko placed him under arrest.

Timmons testified in his own behalf: He resided with John Brooks in the basement apartment of the building located at 4749 West Adams in Chicago. Victor Rainey and his mother lived in the apartment on the first floor; Timmons' sister and father also lived in the building. On January 9, prior to the party, Timmons and John Brooks consumed several pints of gin and beer. At approximately 9 p.m., Timmons arrived at his surprise party, where he consumed more gin, "Canadian Mist," and "a couple cans of beer." Timmons went to the back room of the apartment where Victor Rainey and John Brooks were "having words" about money that Victor had given to Brooks. Shortly thereafter, Timmons went downstairs to his apartment and changed clothes. Timmons then went outside to the front yard of the building. Brooks was standing in the doorway. "A car proceeded to come by the front of the house" and Timmons heard a shot. He thought the shot came from the "dark colored car." "After" he heard the shot, he "ducked" and himself fired a shot. He heard John Brooks say, "I'm hit," and Timmons helped him into the hallway and "placed him by the first stairs going up the stairway." Timmons ran up the stairs leading to the second floor, heard Green call him and "turned around." At that moment, "the gun [Timmons] had went off." He did

not aim the gun. Timmons went down the stairs and left the apartment. He went to a service station and talked with the manager. Later that morning, Timmons surrendered himself at the Fourth Area police station. Timmons stated that his gun did not need to be "cocked" to fire.

Richard Hall, a biochemist, testified with regard to the effect of alcohol on the body. In Hall's opinion, a person who drank as much alcohol as Timmons allegedly consumed on January 9 would be intoxicated but would be able to walk, to speak and to change clothes, although he would be "clumsy" and "slow."

By stipulation, the State introduced into evidence Timmons' 1974 attempted armed robbery conviction. The trial court instructed the jury "to accept this stipulation only for the purpose of assessing the credibility of the witness and for no other reason."

Timmons was found guilty of two counts of voluntary manslaughter. Following a hearing, Timmons was sentenced to extended terms of 25 years on each conviction, the sentences to be served consecutively. Defendant filed a timely notice of appeal.

I

■ Defendant initially contends that the trial court erred in granting the State's motion *in limine*, which prevented admission into evidence as a dying declaration John Brooks' alleged nonverbal statement that Timmons "accidentally" shot him.

The trial court stated that to be admitted into evidence as a dying declaration "the rules of evidence require that the assertions [of a decedent] must be factual, competent and not conclusionary." The court found that the nonverbal responses of John Brooks were "conclusionary" and thereupon denied the admission of these statements into evidence.

Dying declarations have been "broadly defined as extrajudicial statements of fact by the victim, concerning the cause and circumstances of a homicide." (*People v. Thomas* (1977), 49 Ill. App. 3d 961, 970, 364 N.E.2d 641, 647.) Dying declarations are admissible as an exception to the rule against hearsay evidence, where it appears "that they are made by the victim under the fixed belief and moral conviction that death is impending and certain to follow almost immediately, without opportunity for repentance and in the absence of all hope of avoidance, when he has despaired of life and looks to death as inevitable and at hand." (*People v. Tilley* (1950), 406 Ill. 398, 403, 94 N.E.2d 328, 331.) To determine the declarant's consciousness of his approaching death, "recourse must be had to all facts and circumstances at-

tending the party giving the dying declaration at the moment of its utterance. Within this context, the declarant must be sufficiently possessed of his mental faculties as to be able to have accurately perceived, recollected and communicated the circumstances surrounding his death. [Citation.] In making its preliminary determination, outside the presence of the jury, of the challenged statements' admissibility, the trial court must be satisfied beyond a reasonable doubt that the declarant believed himself *in extremis* when the statements were made. [Citation.]" *People v. Thomas* (1977), 49 Ill. App. 3d 961, 364 N.E.2d 641.

Here, the trial court apparently failed to make the required threshold determination as to whether the deceased "believed himself *in extremis* when the statements were made." We have searched the record and find no evidence that Brooks was aware that death was imminent at the time he made the responses in question. Dr. Picache did not advise Brooks of his physical condition because he believed "Brooks was not alert enough to understand." Therefore, we hold, as did the court in *People v. Thomas*, that the evidence here "was insufficient to establish beyond a reasonable doubt that [decedent] considered himself *in extremis* at the time his statements were uttered."

We find, however, that this error was harmless in light of the overwhelming evidence of defendant's guilt. "The object of this court on review is not to determine whether the record is totally free of error, but whether any error occurred which operated to the prejudice of the appellant or unduly affected the outcome below." (*Needy v. Sparks* (1977), 51 Ill. App. 3d 350, 372, 366 N.E.2d 327, 347.) We have carefully reviewed the record, and it is our opinion that in this instance the court's ruling neither prejudiced Timmons nor unduly affected the jury's verdict.

## II

■ Timmons contends that the trial court's instruction limiting the jury's use of defendant's 1974 conviction of attempted armed robbery was prejudicial because its wording did not "conform" to Illinois Pattern Jury Instructions.

Upon Timmons' stipulation that he had been convicted in 1974, the trial judge *sua sponte* instructed the jury:

"Ladies and Gentlemen of the jury, you are to accept this stipulation only for the purposes of assessing the credibility of the witness and for no other reason * * *."

Defendant did not object to this instruction nor tender to the trial court defendant's own version to accord with Illinois Pattern Jury In-

struction (IPI), Criminal, No. 3.13 (2d ed. 1981), which provides:

"Evidence of a defendant's previous conviction of an offense may be considered by you as it may affect his believability as a witness, and must not be considered by you as evidence of his guilt of the offense with which he is charged."

On review, however, Timmons argues that IPI Criminal No. 3.13 instructs the jury that evidence of defendant's prior conviction cannot be considered as evidence of present guilt and that the trial judge's instruction here was "confusing and focused the jury's attention only on the believability of the defendant."

It has been well established that "the failure to object at trial to an asserted error in jury instructions waives the question." (*People v. Tannenbaum* (1980), 82 Ill. 2d 177, 180, 415 N.E. 2d 1027, 1029.) "[I]f an accused wishes certain instructions to be given he must request the court to so act, since the trial judge is under no duty to give instructions upon its own motion." (*People v. Orr* (1962), 24 Ill. 2d 100, 102, 180 N.E.2d 501, 502.) We conclude that defendant has waived this issue.

Moreover, even if we in fact reviewed this issue, we would find no error. Any non-IPI instruction given by the trial court is to be "simple, brief, impartial and free from argument." (87 Ill. 2d R. 451(a).) Here, the trial judge tendered to the jury a brief and accurate statement of the law. In our opinion, no prejudice to defendant resulted from the alleged nonconformance of this instruction.

### III

Defendant contends that the trial court abused its discretion in sentencing defendant to two 25-year extended terms and in ordering the sentences to be served consecutively. Defendant argues that the trial judge did not consider "factors in mitigation"; that "the jury specifically found defendant not guilty of murder"; and that "defendant did not commit voluntary manslaughter on the public at large." Defendant maintains that these factors militate against the imposition of consecutive and extended-term sentences.

### A

With regard to the extended-term sentences, section 5—5—3.2(b) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.2(b)) provides that an extended term may be imposed:

"(1) When a defendant is convicted of any felony, after having been previously convicted in Illinois of the same or greater

class felony, within 10 years, excluding time spent in custody, and such charges are separately brought and tried and arise out of different series of acts; or

(2) When a defendant is convicted of any felony and the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty."

■■ Here, the trial court found that:

"These events and the conduct of the defendant and the conduct which the defendant made, in the Court's opinion, the defendant made an unjustifiable action, in the Court's opinion, grossly wicked reprehensible, odious, and heinous, and indicative of wanton cruelty separately and unrelated except as to place and persons, and in general within a short space of time the defendant with his pistol unjustifiably and unreasonably believing he would be killed shot John Brooks in the neck—in the throat outside of the apartment.

\* \* \*

During part of this event there was testimony that a fear on the part of the persons, there, terror, which the Court does conclude that certainly some anxiousness on the part of Etheral Green, anxiety, implicit in his remarks if you shoot somebody— if you are going to shoot somebody, shoot me.

The scenario was such—the defendant's part in it was such that the Court would find that his conduct was heinous behavior and indicative of wanton cruelty."

Moreover, this was defendant's second conviction for a Class 1 felony within 10 years. This factor alone will support imposition of an extended-term sentence under the statute.

In the instant case, therefore, the imposition of extended terms was in fact supported, and we conclude that the trial court did not abuse its discretion in here imposing such sentences.

B

■■ With regard to consecutive sentences, section 5—8—4(b) of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—4(b)) provides:

"(b) The court shall not impose a consecutive sentence unless, having regard to the nature and circumstances of the offenses and the history and character of the defendant, it is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record."

It has been generally held that "[c]onsecutive sentences should be imposed sparingly. [Citations.] If the trial judge improperly finds that a consecutive term is necessary to protect the public, a reviewing court may order that the sentence be served concurrently." *People v. Zadel* (1979), 69 Ill. App. 3d 681, 683, 387 N.E.2d 1092, 1093.

In our review of this record we are not convinced that here consecutive sentences are mandated. Considering the totality of all pertinent facts, we accordingly modify the sentences to be served concurrently.

## IV

■ Defendant also contends that he was denied a fair trial because the State used three of its peremptory challenges to exclude blacks from the jury. The record indicates the State used 11 peremptory challenges. Eight challenges were used to exclude white persons and three challenges were used to exclude blacks.

In Illinois, the use of peremptory challenges to exclude blacks from the jury does not warrant reversal unless there is a showing of a systematic exclusion by the State of blacks by peremptory challenges "in case after case." *People v. Payne* (1983), 99 Ill. 2d 135, 457 N.E.2d 1202.

Here, we must reject defendant's contention. We are in agreement with the trial court which found that "there was no purposeful discrimination in selection of the members of the jury." Defendant has not shown a "systematic exclusion" of blacks "in case after case." We, therefore, conclude that defendant was not denied a fair trial by the State's use of its peremptory challenges.

For the foregoing reasons, we affirm defendant's convictions for voluntary manslaughter; we modify the sentences to be served concurrently.

Affirmed in part; modified in part.

HARTMAN, P.J., and STAMOS, J., concur.