THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LARRY FELDER, Defendant-Appellant.

First District (2nd Division)   No. 1—89—3502

Opinion filed January 14, 1992.

Michael J. Pelletier, Marc Davidson, and Anna Ahronheim, all of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, David Stabrawa, and Carrie Weiner, Assistant State's Attorneys, of counsel), for the People.

JUSTICE DiVITO delivered the opinion of the court:

Defendant Larry Felder was charged by indictment with murder, attempted murder, and home invasion. (Ill. Rev. Stat. 1985, ch. 38,

pars. 9—1(a)(1), 8—4(a), 12—11(a)(2).) After a jury trial, defendant was found guilty of all charges and sentenced to 80 years' imprisonment for murder, 30 years for attempted murder to run consecutively with the murder sentence, and 30 years for home invasion to run concurrently with the two other sentences.

Defendant appeals both his conviction and his sentence, raising in issue (1) whether the attempted murder instruction given to the jury improperly stated the elements necessary to establish attempted murder; (2) whether the testimony of several State witnesses that they initially withheld information from the police out of fear for their own and their families' safety was properly admitted; (3) whether a photo taken of the deceased prior to her death and the testimony of the deceased's mother about the last time she saw her daughter alive were properly admitted; (4) whether defendant was denied a fair trial due to the State's exercise of a peremptory challenge of one juror in an allegedly racially discriminatory manner; (5) whether the court erroneously found that defendant was eligible for the death penalty; and (6) whether the court abused its discretion in sentencing defendant to consecutive sentences for murder and attempted murder.

At trial, Karen Spaulding (Karen) testified that, on March 14, 1987, she was living with her friend Sharon Eskridge (Sharon) in Sharon's attic apartment located in a single-family house at 734 East 103rd Place in Chicago. Also living in the apartment was Sharon's boyfriend, Guy Brackston.

At 10 p.m. on March 14, 1987, Karen and Sharon left the apartment and took a taxi to the Holiday Inn Mart Plaza, where defendant's brother, Robert Felder (Felder), was hosting a party in three rented suites. Approximately 50 people were at the party, including defendant, whom Karen knew as "Bo Bo," and Sherman Spears, known as "Spiro." Karen had known defendant for approximately one year and Spears for six months; both defendant and Spears sold drugs for Felder, head of the "Pay Masters," a street gang which dealt in narcotics. Felder and the other drug dealers at the party provided champagne, cocaine, marijuana, and heroin for the party guests. While there, Karen drank three or four glasses of champagne and "did do a lot of coke."

Sometime during the night, Felder suffered an asthma attack; Karen helped him by propping him up on a bed, loosening his clothing, and removing his jewelry. After she removed his jewelry, Karen put on Felder's gold necklace and gave his rings to his girl friend.

At approximately 5:30 a.m. on March 15, 1987, Karen left the party with Sharon and Brackston; when they returned to their apart-

ment, Sharon and Brackston went into the bedroom to sleep and Karen slept on the sofa in the living room. Later that morning, at approximately noon, Felder telephoned, asking for Brackston; however, Karen told him that Brackston was asleep. One hour later, Felder called again and told Karen to wake Brackston. After speaking with Felder for about 20 minutes, Brackston hung up and asked Karen about Felder's gold necklace. She then took off the necklace and gave it to Brackston.

Shortly thereafter, the doorbell rang and Karen went down to answer the door; at the door were Willie Streeter and Larry Byrd, both of whom sold drugs for Felder. After she let them into the apartment, the two men went into the bedroom to talk to Brackston. During the time that Streeter and Byrd were in the apartment, Karen took a shower and Sharon sat on the living room couch watching television. When Karen came out of the shower, Streeter and Brackston were leaving the apartment. Because it was not typical of Brackston to leave without telling Sharon, she and Karen discussed whether something might be wrong; Sharon was concerned that Brackston's departure could be because she had taken some money at Felder's party the previous night.

After 10 minutes, Streeter returned to the apartment with defendant and Sherman Spears. Defendant went into the bedroom and Spears followed; Spears then came out and told Karen that she had gotten him in trouble by taking the necklace. Spears grabbed her by the arm and started yelling at her in a "nasty" tone of voice. Streeter stepped between Spears and Karen, telling Spears, "Man, you should freeze that, you know. Don't do that." Defendant then called Sharon into the bedroom with him. After defendant and Sharon came out of the bedroom, defendant told Karen to go into the bedroom.

While in the bedroom, defendant asked Karen why she took money from his brother; Karen denied taking any money and defendant responded, "Bitch, I know you took the money, and I am not going to be standing up here just to keep on asking you about the money and this shit." Defendant then hit Karen on the head with the butt of his gun, a "blue steel .32 automatic." Karen fell crying to the bed and asked defendant why he had hit her; defendant answered, "I am going to kill you, bitch," unless she would tell him where the money and "stuff" was. Defendant then began hitting and kicking Karen. After hitting Karen five or six times, defendant stood up and leaned with his hand against the wall. When Spears entered the room

shortly thereafter, he threw a towel to defendant; defendant then used the towel to clean the area where his hand had touched the wall.

After Spears entered the bedroom, defendant told him to "go get that other bitch and bring her in here." Karen then got off the bed and stood next to a dresser near the wall. When Sharon entered the bedroom, Spears pushed her onto the bed, picked up a pillow, and handed it to defendant. Both defendant and Spears, who had a .38 caliber gun, put their guns inside of the pillows. When Karen then yelled, "no, don't. You know you don't have to do that," defendant turned around and shot her in her left shoulder. As she fell to the floor, Karen could see both defendant and Spears shoot Sharon "about 5 or 6, or more" times. She also could hear two different sounds emitted from the guns. Karen began feeling a "burning sensation" in her body and realized that it was because of her numerous gunshot wounds.

When she was able to get up, Karen called to Sharon, who was lying facedown on the bed, but received no response; she attempted to walk to the living room and call the police but she could not walk very well, was dizzy, nauseated, and everything appeared to her to be in "slow motion." When she got into the living room, she turned down the television volume, which had been turned up; she then locked the door and tried to call the police. Someone then knocked on the door; Karen "hollered, no, no. Don't hurt me, no, no."

A man then broke the glass in the door and opened the door; Karen did not know him, but she told him in "blurred" words that Sharon was in the bedroom, dead. Shortly thereafter, as the police were arriving, Felder telephoned and Karen answered and told him, "Hello, Rob. Your brother and Spiro just shot me, and they killed Sharon." Before hanging up, Felder told Karen that she had better not say anything or he would "do something" to her mother and her child.

Immediately thereafter, the paramedics arrived and took Karen to Bernard Mitchell Hospital, where she underwent surgery. On March 16, 1987, while Karen was still in the hospital, she spoke to several Chicago police detectives; she did not tell them, however, what had happened because she "was still afraid for" herself and her family. After the police assured Karen that they would protect her, she told them that "Spiro" and "Bo Bo" had shot her and Sharon. A few hours later, Karen gave the police defendant's and Spears' proper names and told them where they might find them, an address on the west side of Chicago and the names of several downtown hotels where they usually stayed. During that day and the next, police

showed her some photographs and she identified Spears and defendant as the men who shot her and killed Sharon.

On cross-examination, Karen admitted that she had used drugs with Felder on prior occasions and that her sister was Felder's old girl friend. She also admitted that, after the shooting, she was arrested for possession of cocaine; however, she explained that, at the time of the arrest, she was wearing an old coat, unaware that there was one-tenth of a gram of cocaine in the pocket. She further acknowledged that she never told the police about defendant wiping the wall where his hand had touched, nor did she tell the police that, one year prior to the shooting, she had an argument with defendant and he threatened to kill her.

Nolan Lando testified that, at the time of the shooting, he lived across the street and knew both Sharon and the owner of the building where Sharon's attic apartment was located. On March 15, 1987, the owner of the building called him and told him that something was going on in her house and asked him to come up to the attic apartment with her. Before he entered the apartment, he could see Karen staggering inside, covered with blood, and trying to use the phone. Lando pushed the locked door open with his shoulder; at the time, Karen was yelling at him not to hurt her. Once in the apartment, he could see that Sharon was dead in the bedroom. Five to six minutes after he entered the apartment, as the police were arriving, the phone rang and Karen had a brief conversation; Lando, however, could not hear what she was saying.

Chicago police officer William Peak testified that he was one of the first police officers to arrive at the scene of the shooting; there, he "observed a female black laying across the bed," motionless. He further saw "another female black," who was "bleeding profusely" and in "serious condition" with a gunshot wound through her cheek and several other gunshot wounds to "various parts of her body." While in the apartment, Peak questioned Lando and spoke to Karen for approximately 35 seconds; Karen's speech was difficult to understand, but she was able to tell him that "Bo" was one of her attackers.

Chicago police detective Michael Bosco testified that he spoke with Karen in the hospital on March 16, 1987; however, she was reluctant to answer any of his questions. According to Bosco, Karen "stated she was very much afraid of what had happened to her and what might happen to her in the future. And she was also very much afraid for the well-being of her family." After Bosco assured her that extra security measures would be taken, Karen gave him two names.

Bosco, however, felt that Karen was "holding back certain information" and, thus, requested that someone else interview her.

After talking to Bosco, Chicago police detective George Basile went to Bernard Mitchell Hospital to interview Karen; however, during the interview, Karen was again reluctant and stated that she was concerned about the safety of her child. After Basile's reassurance that the promised security measures had indeed been taken, Karen told him that "Bo" was defendant, but she did not know "Spiro's" real name. Thereafter, Karen identified defendant's picture from a photo array. On cross-examination, Basile admitted that Karen never told him about Felder's phone call after the shooting, nor did she tell him about defendant threatening her in the past.

After being given the information provided by Karen, Chicago police detectives Edmond Leracz and William Pedersen went to the Cabrini Green housing project and several downtown hotels to look for defendant and Spears. On March 17, 1987, after the desk clerk at the Essex Hotel positively identified defendant as one of the registered guests, Leracz and Pedersen set up observation outside of defendant's room. Shortly thereafter, they observed Spears enter the room; when Spears left the room, Leracz approached him, identified himself as a police officer, and "patted him down." In Spears' pocket Leracz found a key to the room and a newspaper clipping about the shooting.

Willie Streeter testified that, at the time of the shooting, he was a member of the Pay Masters; he described himself as "security" in the gang and Felder as the "Don," or leader of the gang. He further described defendant as the "number 2" man under Felder and Spears as Felder's "right hand man, bodyguard and enforcer."

On March 15, 1987, Streeter was with Robert Byrd at a "safe house" that Felder had rented. While at the house, Streeter and Byrd received a phone call from Felder telling them to go to Guy Brackston's house to pick up his money. Streeter and Byrd then went to Brackston's house. After Karen let them into the apartment, the two men entered the bedroom, where Brackston was on the phone. After Brackston got off the phone, Streeter told him that Felder had sent him there to pick up his necklace and $2,000 that had been taken at the party. Brackston then gave Streeter the gold necklace, but before he could give Streeter the money, the phone rang. Brackston answered and spoke for approximately two minutes before he gave the phone to Streeter, saying that it was Felder. Felder asked Streeter if "Bo-Bo" and "Spiro" had arrived yet and Streeter answered "no," but that Brackston had given him the gold necklace and "was in the process of giving" him the money. Felder responded, "Fuck that shit.

\*\*\* Keep everybody in the house there until Spiro and Bo-Bo get there."

After he hung up the phone, Streeter told Brackston that Spears and defendant were on their way to the apartment. He then asked for the money and Brackston gave him $2,500. Immediately thereafter, the phone rang again, Streeter answered and spoke again with Felder. After Felder asked if Spears and defendant were there yet, Streeter told him that he had the necklace and the money; however, Felder stated, "Fuck that shit. \*\*\* Don't let the bitches or Guy out of the house. \*\*\* Keep them there. \*\*\* Bo-Bo and Spiro going to gun them bitches." After he hung up, Streeter warned Brackston to "get your girl and go," because Spears and defendant were on the way to the apartment to "gun y'all down."

Thereafter, Brackston, a drug dealer, packed up his drug paraphernalia and left the apartment with Streeter. As they were leaving the building, Spears, defendant, and another man drove up to the apartment in a van. After asking Streeter where Brackston was going, defendant and Spears entered the apartment. Streeter followed them in.

Once in the apartment, Spears began swearing at Karen and saying that she had made him look bad in front of "the Don"; when Spears, who had a .38 caliber gun, grabbed Karen by the wrist, Streeter attempted to "diffuse" the situation and told Spears to "freeze that shit." Defendant, who had a .32 automatic, then walked over to Sharon and said he needed to talk to her in the bedroom. When Sharon left the bedroom, defendant asked Karen to come into the bedroom.

Shortly thereafter, defendant came out of the bedroom and gave the telephone to Streeter, saying that Felder wanted to talk to him. On the phone, Streeter tried to convince Felder that what was happening made no sense because he already had the money and the necklace. Felder, however, refused to listen and again said, "Man, fuck that shit. They are going to gun those bitches." After he hung up, Streeter went into the kitchen and told Byrd that he was leaving; Byrd then followed him out of the apartment.

Once they left the house, Streeter and Byrd got into the van with the other man. Approximately five minutes later, defendant and Spears came running out and got into the van with their "pistols in their hands." As he drove the van away, defendant turned to Spears and said, "You's a cold mother-fucker"; Spears responded, with a grin, "Man, we gunned them bitches. We gave the bitches 2 to the

head." Defendant and Spears then emptied their guns, wiped them off, and gave them to the other man in the van.

After driving a short while, defendant, Spears, and the other man left the van. Streeter and Byrd drove the van for a little longer, but then parked it and took a cab to the house where Felder was staying.

When they entered the house, Felder asked Streeter what had happened and stated, "Spiro and Bo fucked up. I just got through to that bitch Karen on the phone. The bitch ain't dead."

After the shooting, Streeter never went to the police to give them information; moreover, he refused to answer the questions of both the police and the grand jury. According to Streeter, he did not want to jeopardize his life or his family's safety. Nevertheless, after his arrest and conviction on charges not pertaining to the shooting, Streeter made a plea agreement with the State's Attorney whereby he agreed to testify at defendant's trial.

Chicago police officer Irwin Ternoir testified for defendant that he handled the initial paperwork on the case. After speaking with several officers at the scene of the shooting, Ternoir wrote in his report that the two offenders were "Bo" and "Jeff."

According to Chicago police officer Fred Harris, a latent fingerprint examiner for the police department, he received numerous fingerprint lifts from the crime scene, 21 of which were suitable for comparison purposes. Of those prints, none matched Spears' prints; further, a palm print taken from the scene did not match defendant's print. One print, however, taken from a plastic bag found inside a tool box, matched Jeff Davis' prints.

At the close of all the evidence, the jury found defendant guilty of murder, attempted murder, and home invasion. Finding that defendant was eligible for the death penalty, the circuit court sentenced defendant to 80 years for murder, 30 years for attempted murder to run consecutively with the murder sentence and 30 years for home invasion to run concurrently with the other sentences. Defendant appeals both his conviction and his sentence.

I

Defendant initially contends that the instructions given by the circuit court improperly allowed the jury to convict him of attempted murder if it found that he merely intended to do "great bodily harm" without the requisite intent to kill. In response, the State maintains that defendant has waived appellate review of this issue due to his failure to object at trial or to raise the issue in his post-trial motion. (See *People v. Solis* (1991), 216 Ill. App. 3d 11, 576 N.E.2d 120.) In

the alternative, the State contends that any error which may have resulted from the instructions was harmless in light of the proper instructions which were given and the overwhelming evidence of defendant's guilt.

At trial, the jury was instructed as follows:

"A person commits the offense of murder when he kills an individual without lawful justification if, in performing the acts which caused the death,

he intends to kill or do great bodily harm to that individual; or

he knows such acts will cause death to that individual; or

he knows that his acts created a strong probability of death or great bodily harm to that individual; or

he is committing the offense of home invasion."

The court then instructed the jury on the propositions that the State must sustain in order to prove the charge of murder:

"First: That the defendant or one for whose conduct he is legally responsible, performed the acts which caused the death of Sharon Eskridge; and

that when the defendant or one for whose conduct he is legally responsible did so, he intended to kill or do great bodily harm to Sharon Eskridge; or

he knew that his act would cause death or great bodily harm to Sharon Eskridge; or

he was committing the offense of home invasion."

The court next gave the jury an instruction which defined attempted murder:

"A person commits the offense of attempt murder when he, with the intent to commit the offense of murder, does any act which constitutes a substantial step towards the commission of the offense of murder.

The offense attempted need not have been committed."

Thereafter, the court instructed the jury as to the elements necessary for an attempted murder conviction:

"To sustain the charge of attempt murder, the State must prove the following propositions:

First: That the defendant or one for whose conduct he is legally responsible performed an act which constituted a substantial step towards the commission of the offense of murder; and

Second: That the defendant or one for whose conduct he is legally responsible, did so with intent to commit the offense of murder."

Thus, defendant contends, the jury was instructed that it could find him guilty of attempted murder on a finding that he intended to kill Karen Spaulding, but that the jury was also additionally, but erroneously, instructed that it could likewise find him guilty of attempted murder on the jury's alternative finding that he solely intended to do great bodily harm to Karen.

Specific intent to kill is an essential element of the offense of attempted murder and, correspondingly, a finding of nothing less than proof of specific intent to kill is necessary to support a conviction for attempted murder. (*People v. Jones* (1979), 81 Ill. 2d 1, 405 N.E.2d 343; *People v. Harris* (1978), 72 Ill. 2d 16, 377 N.E.2d 28; *People v. Velasco* (1989), 184 Ill. App. 3d 618, 540 N.E.2d 521.) "*Knowledge* that the consequences of an accused's act may result in death (or grave bodily injury), *** is not enough; specific intent to kill is required [citation]. Both the indictment and the instructions must unambiguously reflect this." (Emphasis in original.) *People v. Jones*, 81 Ill. 2d at 8-9.

Where a defendant is tried for both murder and attempted murder, as here, the court, for the purpose of the attempted murder charge, must give a separate instruction defining murder which limits the murder definition to acts committed with the specific intent to kill. (*People v. Velasco*, 184 Ill. App. 3d at 632.) Attempted murder instructions such as those given in the instant case, which include the full definition of murder, are erroneous. *People v. Harris*, 72 Ill. 2d 16; *People v. Trinkle* (1977), 68 Ill. 2d 198, 369 N.E.2d 888.

Nevertheless, the State asserts that, assuming *arguendo* that the jury should have received a modified instruction, any error was harmless. The State maintains that an error in instructions will not justify reversal where, as here, the evidence of defendant's guilt was so overwhelming that even if properly instructed the jury could not reasonably have found him not guilty.

■ Because "[t]he interests of justice demand that the rule of waiver be modified, in criminal cases, where necessary to ensure fundamental fairness," which includes "seeing to it that certain basic instructions" are given (*People v. Ogunsola* (1981), 87 Ill. 2d 216, 222, 429 N.E.2d 861), the State's initial assertion that the error was effectively waived must fail. We find, however, that there was not grave or substantial error in the failure to give the proper instructions. " 'Even though error may have been committed in giving or refusing instructions it will not always justify reversal when the evidence of defendant's guilt is so clear and convincing that the jury could not

reasonably have found him not guilty.' " *People v. Jones*, 81 Ill. 2d at 9, quoting *People v. Ward* (1965), 32 Ill. 2d 253, 256, 204 N.E.2d 741.

In the instant case, that defendant and Spears attempted to murder Karen Spaulding was evident from the circumstances. Not only did Karen testify that defendant told her that he was going to kill her if she did not give him the money, but she also testified that, after he shot her in the left shoulder, he began shooting at Sharon. Moreover, Streeter testified that Felder told him a number of times that defendant and Spears were going to "gun them bitches." Streeter also testified that, after the shooting, Spears stated that *"we* gave the bitches 2 to the head," meaning he and defendant. (Emphasis added.)

Defendant's contention that the evidence against him that he intended to kill Karen was not overwhelming is incorrect. Defendant asserts that "Sharon Eskridge was shot in the brain and killed by Sherman Spears"; however, the pathologist testified that the cause of death was multiple gunshot wounds, not just the wound to her head. Defendant additionally maintains that the evidence "shows that Spears *** fatally shot [Sharon] Eskridge in the head and also shot [Karen] Spaulding, while Mr. Felder may have only shot [Karen] Spaulding in the shoulder"; however, it is clear from Karen's testimony that both defendant and Spears were shooting at both women. Defendant's reliance upon *People v. Okundaye* (1989), 189 Ill. App. 3d 601, 545 N.E.2d 601, to support his argument is misplaced. There, the evidence "was far from overwhelming that the defendant intended to kill" his victim. *People v. Okundaye*, 189 Ill. App. 3d at 607.

Because the evidence in the case at bar that defendant intended to kill Karen was overwhelming, we find that any error in the court's instructions was harmless.

## II

Defendant next contends that the circuit court erred in allowing testimony from the State's witnesses that they were reluctant to cooperate with the police out of fear for their safety. Specifically, defendant maintains that the admission of this testimony was prejudicial because it gave rise to the inference that the witnesses' fears were due to threats by defendant.

In response, the State initially maintains that defendant has waived review of this issue because of his failure to object at trial. In the alternative, the State contends that the testimony was highly relevant as to the credibility of the witnesses and was not outweighed by any prejudicial effect.

Certainly, prosecutorial comments which suggest that witnesses were afraid to testify because the defendant had threatened or intimidated them, when not based upon any evidence in the record, are highly prejudicial and inflammatory. (*People v. Mullen* (1990), 141 Ill. 2d 394, 405, 566 N.E.2d 222.) Evidence of the fears of witnesses is relevant and admissible, however, where it tends to prove a material fact in issue and its probative value outweighs its prejudicial effect. See, *e.g., People v. Eyler* (1989), 133 Ill. 2d 173, 217-18, 549 N.E.2d 268.

■ Despite defendant's contentions to the contrary, the witnesses' testimony, in the instant case, did not give rise to the inference that defendant in any manner threatened them. Rather, the testimony merely explained why those witnesses initially were reluctant to speak to the police. Karen Spaulding explained that she did not, at first, give the detectives any names, even though she thought there was a good chance that she might die from her wounds, because she was fearful that defendant and Spears would be able to again "get to" her. Moreover, Streeter explained his failure to cooperate with the police or the grand jury by stating that he was afraid for himself and his family. Thus, the testimony concerning witnesses' fears explained why those witnesses did not initially provide information to the police.

Accordingly, the court did not err in admitting the foregoing evidence; however, even if the evidence was improperly admitted, the alleged error is harmless where, as here, evidence supporting defendant's conviction is so overwhelming that his conviction would have resulted even if the alleged error was eliminated. *People v. Jackson* (1990), 195 Ill. App. 3d 104, 551 N.E.2d 1025.

### III

Defendant next contends that the circuit court erred in admitting both a photograph of Sharon taken prior to the shooting and the testimony of Laura Eskridge, Sharon's mother, about the last time she saw her daughter alive. Specifically, defendant maintains that the admission of the photograph and the testimony from Sharon's mother so prejudiced the jury that defendant was denied a fair trial.

In response, the State initially maintains that defendant has waived review of this issue because of his failure to object at trial. In the alternative, the State contends that, since the evidence was incidental and since the testimony was not related to defendant's guilt, the evidence was properly admitted.

At trial, Laura Eskridge testified that the last time she saw her daughter alive was on March 13, 1987, when Sharon visited her fa-

ther in the hospital; on that day, according to Eskridge, Sharon was in fine health and in good spirits. The next time Eskridge saw her daughter was at the morgue.

During her testimony, Eskridge provided a photograph of Sharon depicting the way she looked prior to the shooting. Later in the trial, despite defense counsel's objections to the photograph as prejudicial, the court entered the photograph into evidence and allowed the jury to use it during its deliberations.

Generally, the State is entitled to call "life and death" witnesses to establish that a murder victim had been alive prior to the events at issue. (*People v. Toth* (1982), 106 Ill. App. 3d 27, 435 N.E.2d 748.) Even where the defendant stipulates to the identity of the deceased and to her death, such testimony is properly elicited. (*People v. Williams* (1985), 137 Ill. App. 3d 736, 744, 484 N.E.2d 1191; *People v. Starks* (1983), 116 Ill. App. 3d 384, 390, 451 N.E.2d 1298.) However, where testimony " 'in a murder case respecting the fact the deceased has left a spouse and family is not elicited incidentally, but is presented in such a manner as to cause the jury to believe it is material, its admission is highly prejudicial and constitutes reversible error.' " *People v. Free* (1983), 94 Ill. 2d 378, 414, 447 N.E.2d 218, quoting *People v. Bernette* (1964), 30 Ill. 2d 359, 371, 197 N.E.2d 436.

■ In the instant case, the photograph, which Eskridge testified accurately depicted what Sharon looked like on the day of her death, merely illustrated her testimony. Moreover, Eskridge's testimony that Sharon was 29 years old at her death and one of eight children in the family was incidental and not presented in such a manner as to cause the jury to believe it to be material to defendant's guilt.

Although defendant urges this court to find that the admission of the testimony and the photograph was prejudicial, the cases relied upon by defendant reveal that the prosecution there did more than just make the jury aware of the fact that the deceased left behind a family. Rather, in those cases, the prosecution dwelt upon the deceased's family in opening statement and closing argument to the point that the jury could have related the evidence to the defendant's guilt. (See *People v. Hope* (1986), 116 Ill. 2d 265, 508 N.E.2d 202; *People v. Logan* (1991), 224 Ill. App. 3d 735; *People v. Starks*, 116 Ill. App. 3d 384, 451 N.E.2d 1298.) Here, the evidence was not accompanied by testimony or statements specifically regarding the family left behind by Sharon, nor was there an inflammatory closing argument.

"Common sense tells us that murder victims do not live in a vacuum and that, in most cases, they leave behind family members." (*People v. Free*, 94 Ill. 2d at 415.) Thus, not every mention of a de-

ceased's family *ipso facto* entitles the defendant to a new trial, since in certain instances such a statement can be harmless. (*People v. Free*, 94 Ill. 2d at 414.) Accordingly, we find that defendant was not denied a fair trial due to the admission of the photograph of Sharon and Eskridge's testimony.

IV

Defendant next contends that this case should be remanded to the circuit court for a hearing, pursuant to *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, on whether the State violated his equal protection rights by exercising a peremptory challenge during jury selection to prevent a black venireperson from serving on his jury solely on account of her race.

In order to establish a *prima facie* case of purposeful discrimination during *voir dire*, a defendant must show that he is a member of a cognizable racial group, that the State exercised its peremptory challenges to remove members of that group, and that other relevant circumstances exist which raise an inference that the prosecutor used the peremptory challenges to exclude venirepersons from the jury on racial grounds. (*Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712; *People v. Baisten* (1990), 203 Ill. App. 3d 64, 73-74, 560 N.E.2d 1060.) Further, the Supreme Court has recently held that "a criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded jurors share the same race." *Powers v. Ohio* (1991), 499 U.S. 400, 402, 113 L. Ed. 2d 411, 419, 111 S. Ct. 1364, 1366.

Although it is true, as defendant argues, that even the exclusion of just one minority venireperson for racial reasons is unconstitutional and grounds for reversal (*People v. Harris* (1989), 129 Ill. 2d 123, 544 N.E.2d 357), a *prima facie* case of discriminatory use of peremptory challenges cannot be established merely by the numbers of venirepersons stricken by the prosecution. Rather, the issue is whether this fact, in addition to "any other relevant circumstances," raises an inference that the prosecutor conducted purposeful discrimination. (*People v. Holman* (1989), 132 Ill. 2d 128, 172-73, 547 N.E.2d 124.) "Relevant circumstances" include a pattern of strikes against black venirepersons; a prosecutor's questions and statements during *voir dire* examination and in exercising his challenges; the disproportionate use of peremptory challenges against blacks; whether the excluded blacks were a heterogeneous group sharing race as their only common characteristic; the level of black representation in the venire

as compared to the jury; the race of the defendant and the victim; and the race of the witnesses. *People v. Baisten*, 203 Ill. App. 3d at 74-75; *People v. Mahaffey* (1989), 128 Ill. 2d 388, 413, 539 N.E.2d 1172.

■ In the instant case, during *voir dire*, the State excused potential juror Melanie Walters by exercising a peremptory challenge. The defense objected and requested a race-neutral reason for the exclusion. The circuit court declined to compel the State to provide a reason, stating that "there is not an appearance in my mind as to a violation of" *Batson v. Kentucky*. The court further found that several witnesses, defendant, and juror Walters were black.

At the conclusion of jury selection, the court found that

> "the State has used six out of seven peremptory challenges. All of them were used for white jurors except one, and that one was Melanie Walters. The defense has used up seven peremptory challenges. Two of them were for blacks, one was for an Asian, and four were for white and some of those were tendered by the State. And on the jury right now we have four blacks, one Asian, and six whites.
>
> The blacks in the jury are in a higher proportion than the number of prospective jurors that we had out there in the Court's estimation, and further the Court sees no preliminary showing by the defense that the State is challenging blacks because of their race."

Because a circuit court's determination that a defendant failed to establish a *prima facie Batson* case will not be overturned unless it is against the manifest weight of the evidence (*People v. Mahaffey*, 128 Ill. 2d at 413; *People v. Batchelor* (1990), 202 Ill. App. 3d 316, 323, 559 N.E.2d 948), defendant's request for a *Batson* hearing is denied. Applying the principles enunciated to the case at bar, we find that the record fails to establish a case of purposeful discrimination, and thus, the court did not err in finding that defendant failed to establish a *prima facie* case of discrimination.

## V

Defendant next contends that the circuit court erroneously found him eligible for the death penalty. Specifically, defendant urges that the court erred in finding that he inflicted physical injuries on Sharon contemporaneously with those injuries inflicted by Spears. Rather, defendant contends that no evidence was presented as to whether his gun inflicted any of Sharon's wounds. Thus, defendant maintains, the

court's error mandates that his sentence be vacated and the cause remanded for a new sentencing hearing.

For support, defendant points to the trial testimony of Robert Kirschner, the forensic pathologist, who testified that Sharon suffered several gunshot wounds: among them, one to the head, from which a .38 caliber bullet was recovered, and one to the neck, from which no bullet was recovered. According to Kirschner, the cause of her death was "multiple gunshot wounds." Thus, defendant maintains, because no .32 caliber bullet was recovered from Sharon's body, there was no proof that he actually shot her.

A defendant is eligible for the death penalty only if the State proves beyond a reasonable doubt that a statutory aggravating factor exists. (*People v. Simms* (1991), 143 Ill. 2d 154, 169, 572 N.E.2d 947.) In the instant case, defendant's eligibility for the death penalty was predicated upon the statutory aggravating factor set out in section 9—1(b)(6) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)), which authorizes the imposition of a death sentence upon a defendant who commits a murder, or inflicts injuries contemporaneously with those causing death, in the course of another felony. See *People v. Kokoraleis* (1989), 132 Ill. 2d 235, 276, 547 N.E.2d 202.

In the case at bar, during the eligibility hearing for the death penalty, the court made a series of findings before ruling that defendant was eligible. The court initially found that defendant was over 18 when the offense was committed and that the victim was killed during the course of another felony, home invasion. Next, the court found that the murdered victim "received physical injuries personally inflicted by the defendant substantially contemporaneously with physical injuries caused by" one for whose conduct the defendant was legally accountable. Based upon these findings, the court held that defendant qualified for the death penalty. See Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6).

▪ Notwithstanding defendant's argument, it does not appear that the circuit court sentenced defendant under a mistaken belief that he was eligible for the death penalty. Although defendant argues that the autopsy did not reveal that a bullet from his gun wounded Sharon, Karen testified that she saw both defendant and Spears shooting at Sharon and, further, she heard two different sounds coming from the two guns. Based on this evidence, the court properly found that the State met its burden to prove that defendant inflicted injuries on Sharon contemporaneously with those injuries inflicted by Spears beyond a reasonable doubt. Accordingly, defendant's request for a new sentencing hearing is denied.

## VI

Defendant lastly contends that the circuit court improperly sentenced him to consecutive terms for murder and attempted murder. Specifically, defendant maintains that the record fails to support the court's conclusion that consecutive sentences were necessary to protect the public. The State maintains, in response, that in light of the evidence presented at trial and at the sentencing hearing, the court properly sentenced defendant to consecutive terms.

The applicable statute at the time of defendant's sentencing granted the discretion to impose consecutive sentences where the court was of the opinion that such a term was necessary to protect the public from further criminal conduct by the defendant. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—4(b).) Although sentencing courts are vested with wide discretion so that reasoned judgments as to the penalty appropriate to the particular circumstances of each case can be accomplished, consecutive sentences should be imposed sparingly and only in instances demanding such sentences. *People v. O'Neal* (1988), 125 Ill. 2d 291, 297, 531 N.E.2d 366; *People v. Timmons* (1984), 127 Ill. App. 3d 679, 687-88, 469 N.E.2d 646.

■ In the case at bar, during the sentencing hearing, the circuit court reviewed the factors in mitigation—defendant's one prior conviction for delivery of a controlled substance, his attendance of high school, his wife's and friend's testimony concerning his good character—but did not find that those factors effectively excused defendant's behavior. In aggravation, the court noted that defendant committed the shooting while on probation from the other offense, that defendant's conduct was "cruel," and that the sentence was necessary to deter others from committing crimes. The court did not, however, note specifically that a consecutive term was necessary for the protection of the public.

Although the sentencing court is not required to recite the language of the statute in reaching its determination that a consecutive sentence is warranted, the record must show that the court is of the opinion that a consecutive term is necessary for the protection of the public. (*People v. O'Neal*, 125 Ill. 2d at 299.) Here, it appears from the record that the circuit court did not abuse its discretion, but rather, seriously considered all factors in mitigation and aggravation, and determined, based on those factors and the evidence presented at trial, that a consecutive sentence was mandated. While the amended statute arguably mandates consecutive sentences in the instant case (see Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—2(a)), the former stat-

ute, applicable in this case, vested discretion in the court. Because we find that the circuit court did not abuse its discretion, we affirm defendant's sentence.

## VII

Defendant also claims, though not delineated as a separate issue, that he was denied effective assistance of trial counsel because of his attorney's failure to object to the allegedly erroneous jury instructions; to the allegedly prejudicial testimony concerning witnesses' fears; and to the allegedly prejudicial testimony of Sharon's mother and the admission of Sharon's photograph.

To establish a denial of his constitutional right to representation by competent counsel, defendant must establish that his representation fell below an objective standard of reasonableness and that his attorney's shortcomings were so serious as to deprive him of his right to a fair trial. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *People v. Johnson* (1989), 128 Ill. 2d 253, 538 N.E.2d 1118.) Defendant must clearly establish not only that his attorney was actually incompetent in the performance of his duties, but also that were it not for that incompetence the outcome of the trial would likely have been different. *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.

■ Here, defendant has failed to establish a denial of his constitutional right to counsel; rather, defendant has raised only a cursory allegation of ineffective assistance of counsel. Because defendant has failed to establish that his representation fell below an objective standard of reasonableness, his assertion of ineffective assistance of counsel must fail.

For the reasons stated, we affirm defendant's conviction and sentence.

Affirmed.

SCARIANO and McCORMICK, JJ., concur.