THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JEFFREY PEARSON, Defendant-Appellant.

Second District   No. 2—92—0567

Opinion filed November 10, 1993.

G. Joseph Weller and Kim M. DeWitt, both of State Appellate Defender's Office, of Elgin, for appellant.

Paul A. Logli, State's Attorney, of Rockford (William L. Browers, Robert J. Biderman, and Linda Susan McClain, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE BOWMAN delivered the opinion of the court:

The defendant, Jeffrey Pearson, was indicted on two counts of aggravated criminal sexual assault (Ill. Rev. Stat. 1991, ch. 38, par. 12—14(a)(1) (now 720 ILCS 5/12—14(a)(1) (West 1992))) and one count of aggravated unlawful restraint (Ill. Rev. Stat. 1991, ch. 38, par. 10—3.1 (now 720 ILCS 5/10—3.1 (West 1992))). A jury convicted the defendant of one count of aggravated criminal sexual assault (Ill. Rev. Stat. 1991, ch. 38, par. 12—14(a)(1) (now 720 ILCS 5/12—14(a)(1) (West 1992))) and one count of aggravated unlawful restraint (Ill. Rev. Stat. 1991, ch. 38, par. 10—3.1(a) (now 720 ILCS 5/10—3.1 (West 1992))). The defendant was sentenced to an 18-year term of incarceration. On appeal, the defendant asserts (1) he was not proved guilty beyond a reasonable doubt; (2) reversible error occurred when the tendered jury instructions omitted the element of the use of force or the threatened use of force; and (3) reversible error occurred when he was not permitted to introduce evidence of the complainant's bias. We reverse.

At trial, the complainant testified. Her testimony was corroborated by the testimony of the defendant's mother, Florence Tillery, and by the testimony of complainant's sister, Rhonda Engle. The 25-year-old complainant testified that on October 24, 1991, at about 9:30 p.m., she went to Chuck and Berty's home and smoked cocaine with them until sometime after 3:15 a.m., the last time she looked at a clock. Chuck and Berty were next-door neighbors and family friends of the complainant's family as she was growing up. They had introduced her to cocaine. She would get cocaine from Chuck and Berty, or from the place on Oakley Avenue to which Berty took her. At that place, Berty introduced the complainant to a man named Foots so that she could buy the drug directly from him. By October 25, 1991, the complainant had been to Foots about five times to buy cocaine by herself.

When she left Chuck and Berty's on October 25, 1991, she went to the place on Oakley Avenue. She planned to have Foots cash an $80 money order and sell her $30 worth of cocaine with part of the proceeds. However, Foots did not have any cocaine, but said that he was expecting a delivery in one hour. While deciding whether to wait or go home, the complainant was approached by the defendant.

The complainant explained that she had seen the defendant a few other times. She had first met the defendant two or three weeks prior to October 25, when she had gone to Oakley Avenue with Berty to see Foots. She and Berty had given the defendant and a man called "Scrap" a ride to pick up a package of cocaine. When they returned to Oakley Avenue, the defendant gave the complainant a hit off his pipe for giving him a ride. The defendant asked the complainant to call him Special, and when she told him that she was not comfortable with that, he said that was all she needed to know for now.

The complainant also testified that she also saw the defendant one night when she went over to Chuck and Berty's. Berty was smoking cocaine. Berty and the defendant had words and then the defendant asked the complainant to give him a ride home. First, they stopped at a bar, and the complainant waited in the car, then they went to what defendant said was his sister's house, and then finally the defendant directed the complainant to his house. She recalled that his house was on Concord Avenue, right across from the projects. On this occasion, she merely let him off and did not go into the house. In addition to those two times, the complainant saw the defendant at Oakley Avenue off and on.

On October 25, 1991, when the defendant approached her, he asked if she was trying to make a purchase and asked to look at the

money order. He tried to talk her into purchasing the full $80 worth, but she told him she wanted $50 of the money for a car payment. At this point, Foots was waiting for a delivery of more cocaine. Then the defendant said that if the complainant would give him a ride to his house, he had cocaine there. The complainant had never bought cocaine from the defendant, never smoked cocaine with the defendant besides that one hit, did not really know the defendant, and assumed she would be going into his house since the cocaine was inside. She had been standing, talking with Foots, when the defendant made his suggestion. Foots was someone who knew everybody who went to Oakley, so she turned to Foots and asked him if he thought this was okay. He kind of shrugged his shoulders, so the complainant said okay. At this point she was not frightened of defendant at all.

Then the complainant drove the defendant to his house. The fact that the defendant had been in the complainant's car was corroborated by the testimony of Detective Houde and forensic scientist Powers that a partial latent fingerprint taken from the passenger side door above the door handle of the complainant's car was made by the defendant. She again told the defendant that she was not comfortable with calling him Special and, while in the car, learned the defendant's real name. When they arrived at the defendant's house, the defendant explained that his mother was getting ready to leave for work. He told the complainant to stay in the car because his mother would not like him bringing a white girl into the house. The defendant then got out of the car and went to the door. His mother backed her car out so that it was next to the complainant's. The defendant had trouble with his keys; his mother got out of her car, and they both went into the house. Then his mother came outside and got into her car, and the complainant and the defendant's mother waved to each other as she left. The defendant's mother, Florence Tillery, corroborated the complainant's story that the complainant was at the house on October 25, 1991. Mrs. Tillery testified that she left for work at about 7 a.m. The defendant then signalled to the complainant that it was okay for her to come in. The complainant went in the back door and sat at the kitchen table. Defendant went upstairs.

The complainant yelled upstairs, asking if she could use the rest room. Defendant told her to go ahead. When she came out of the bathroom, she noticed that the lock on the back door was one that required a key to get out. She thought "oh no," but then she thought that she was just being paranoid because things like that do not happen. The defendant then called down to her again and said, "Go ahead and come up." The complainant told him that she would wait

downstairs. The next thing she knew, he was downstairs and had hold of her. He held her arms and started pulling her upstairs. The complainant testified that she fought with everything she had by trying to grab a hold of the railing, walls, and anything she could. She remembered that she told him to please not rape her. He took her upstairs to a little bedroom.

Once upstairs, he kept trying to throw her on the bed. She tried to sit on the floor and was asking him, "please don't rape me, please don't hurt me." The defendant said he was not going to rape her or hurt her. She asked him why he did not let her sit on the floor. He finally picked her up and put her on the bed forcibly and lay on top of her while they were both clothed. He told her that they could do this the easy way or they could do it the hard way, but he was going to get what he wanted. Her hands were covering her face and she was crying and shaking. She kept saying, "My God, this can't be happening." The defendant told her to quit crying and being a pussy because this was the real world. He then told her to take her clothes off. She just lay there. Then he got a gun from somewhere and again told her to take her clothes off. He rolled off of her and she just looked at him. He asked her if she was deaf. She said "no" and the defendant said, "Then get naked." The defendant was still holding the gun. The complainant then stood up and looked at him. He asked her again if she was deaf, she said "no," and then he said, "Then do it." She then started very slowly taking her clothes off. He told her she was doing it too slowly and that she should hurry up. The defendant then grabbed hold of her arm and pulled her down on the bed. The defendant stood up and took his clothes off. He asked her if she wanted him to use a condom. The complainant said, "Yes, if you have to do this, then use it." He then said he did not want to get AIDS anyway, so he put on the condom. The defendant then had vaginal intercourse with the complainant.

He told her that she was going to do what he said to do. He told her that she was his woman now and that she was in this to the end. He made threats against her life if she told anyone. He said that if he thought she was slick, he would find her and kill her because he knew where she lived. He asked her if he was "the first nigger that had ever been between her legs." When he was penetrating her she tried not to look at him, but he kept telling her to look at him. If she did not, he would grab her chin and make her look him in the face. When he was finished, he rolled over on the bed and put his arm and leg over her so she could not move. He talked for a little while and then fell asleep.

The complainant then described the bedroom as an attic with slanted walls, an old stereo with lift-up doors and a turntable inside, an ironing board with an iron on it, an old chair, some dirty clothes, and a mirror covered with college stickers leaning against the wall to the left of the bed. The complainant's testimony concerning details of the inside of the defendant's house including a description of the upstairs bedroom and locks on the doors requiring keys was corroborated by the testimony of the defendant's mother.

After this first forced intercourse, the complainant asked if she could go to the bathroom. The defendant said he wanted her to take a bath so that there would be no evidence. They both went downstairs, and the defendant ran water and dish soap in the bathtub for a few minutes. He then told her to get in and bathe. So she got in and sat there for a few minutes after he had left the room. When the defendant came back into the bathroom, she asked him if she could cry now, and he told her that she could. Apparently he had gotten angry when she was crying before, and she thought she would ask instead of getting herself in more trouble. She then started to cry, and he said that was enough. She recalled that he said, "You're really upset by this, aren't you?" The complainant said she was. He said, "Do you think you've been raped?" She replied that she did. He then said, "You haven't. You wouldn't give it to me so I had to take it."

A few minutes later he told her to get out of the bathtub and make him a hambürger. As she was cooking it, she was crying so hard that he told her to sit down, and he finished cooking the hamburger. They then sat down at the table, and he started looking through her purse. He wanted her boyfriend's name, address, and phone number. He found a photo of her nephew who lived in Mississippi. He then wanted her parents' names, address, and phone number. She panicked when he asked about her parents, as her parents were old; she could not imagine why he would want their phone number and address, and she asked why did he want that information. He would not tell her why; he just said that he needed it. He then wanted her to call her workplace and say that that she was sick and would not be in that day. She told him it would do no good to call work since she ran the office and answered the phone. He did not believe her, so he got on an extension while she dialed her work number and let the phone ring 13 to 14 times. At this point, she was only wearing a towel. The fact that the defendant and the complainant had disturbed the bathroom towels was corroborated by the testimony of the defendant's mother in which she stated that after she got home from work on October 25,

1991, she found the bathroom towels in the only upstairs bedroom with a bed in it.

At that point, the defendant decided that they were going to leave for a while, so he said, "Let's go put on our clothes." Upstairs, she started to put on her clothes. He sat back on the bed, laughed, and said, "You thought I was serious." She knew that he had the gun but it was not right in his hand. He then made her take her clothes off and had vaginal intercourse with her again. This time, he asked her several times if she had ever had anal sex. She told him no.

After intercourse, the defendant fell asleep with his arm and leg over her. She wriggled free but he woke up. He asked her what she was doing. The complainant told him she was hungry and wanted to go downstairs and fix herself something to eat. He told her that if he had to be awake, she was going to "suck his dick." He rolled over on his back, made her go between his legs, and forced her head and mouth down on his penis. She started to gag as though she was going to throw up, so he decided she did not have to do that as he did not want her to throw up all over him. He then made her get on top of him. He put his hands on her hips and moved her back and forth. He made references to riding cowboy. If she did not look in the mirror as he wanted, he would put his hand on her chin and made her look. He pulled his penis out before he had an orgasm.

After the defendant fell asleep again, she got free of him and put on her sweatshirt and pants. She looked through his pants and jacket for his keys to no avail. She went downstairs to look for the keys. She tried the back door and it needed a key. She checked the front door and it had the same kind of lock. She looked through the rooms for a window so that she could get out, but there was none. Then the defendant woke up and yelled down. She ran into the bathroom. He said, "What are you doing?" She said she was fixing her hair. She ran the water and waited to hear if he had gone back to sleep. When she thought it was okay, she started looking for the keys. It could not have been more than five minutes when the defendant came down the stairs. She quickly opened the refrigerator as though she was looking for something to eat. He accused her of calling the police. She explained that she had not because there was an extension next to his bed and if he had heard her, she did not think the police could get there in time. The defendant told her that they needed to put on their clothes so that they could go and get something to eat.

The defendant told her that he wanted her to prostitute for him. He said that he was going to take her to where three or four guys lived, she was going to make money for him, and they were going to

jump in her car and go to Georgia. Upstairs, she started to put on her clothes again. He again said, "Ha, ha, you thought I was serious." He took her sweatshirt out of her hand and told her to take her clothes back off.

Eventually, she and the defendant left the house. He said that they were going to her house so that she could get cleaned up and then they would go out to eat and see his friends. When they left the house, he had to unlock the back door. He told her again that if she was slick and tried to run or told anybody, he would find her and kill her. They got into the car. The defendant drove. He wanted to go to her house and she kept making excuses why they could not, even making up a story about a roommate. He took a utility bill which had her address on it from the backseat.

Finally, they drove to the Jane Addams housing project, and he told her to meet him there in an hour. She was to go home and get cleaned up. The last thing he said when he got out of the car was, "Remember, if you're slick, I'll kill you."

The complainant testified that after the defendant got out of the car, she went to her sister Rhonda's house. The complainant's older sister, Rhonda Engle, testified that on October 25, 1991, at 10:45 a.m., the complainant came into her home, crying. The complainant did not knock. She grabbed Rhonda. Rhonda asked her what was wrong, and the complainant did not say anything immediately. She cried for 5 to 10 minutes. Rhonda testified that the complainant looked messy: her hair was not neat and she was not wearing makeup, which was unusual. After asking what was wrong a couple of times, the complainant finally told Rhonda she had been raped. The complainant continued to cry and shook. When Rhonda hugged the complainant, the complainant's body reacted. Afterward, she had told Rhonda that the hug had hurt.

The complainant testified that after the rape she noticed that she had two big bruises, one on each arm, some bruises around her elbow, some on her back, and some on her buttocks. The police took photos of her arms at the hospital on October 25, 1991. Such photos were entered into evidence at trial, and complainant identified those as photos of the bruises on her arms on October 25, 1991, and photos of the bruises a couple of days later. The photos showing recent bruises, and the complainant's reaction to being hugged by her sister, corroborate her testimony that the defendant grabbed her by her arms and pulled her upstairs, that she resisted, and later, after she had undressed, the defendant grabbed hold of her arm and pulled her down on the bed.

Rhonda testified that when she told the complainant that they needed to call the police, the complainant said no, she continued to cry, and then became more upset. The complaining witness said she could not call the police because he would kill her. The complainant also said that he knew where she lived. Rhonda finally called the police and then their parents. The facts related in her complaint to Rhonda corroborate the complainant's testimony at trial: that she had been raped, that he had threatened to kill her, and that he knew where she lived.

Rhonda also testified that after October 25, 1991, the complainant stayed with her for seven to eight days. During this time, the complainant cried on and off, bathed a lot, and brushed her teeth a lot. The complaining witness' appearance after the alleged rape was consistent with the fact that she had been violated. After reviewing the record, we believe it is reasonable to draw the conclusion that the jury could infer from her conduct of crying and obsessive bathing and brushing of teeth for over a week after the rape that such conduct corroborated her story of the rape. Furthermore, the complainant's testimony is corroborated by the fact that she still had her money order after the ordeal. The complainant's testimony is also corroborated by her prompt complaint to her sister, Rhonda, her appearance after the rape, and the severe bruises on her arms.

The complainant's testimony concerning the rape was corroborated in part by her statements to police, although her testimony to police displayed some discrepancies. After her sister Rhonda called the police, the complainant talked to Officer Patterson. The complainant admitted during testimony that she made up a story to tell the police because she was afraid that the defendant would find her and then would kill her. What she told Officer Patterson (that she admitted was wrong) was that she had been on her way to a girlfriend's house and stopped to use a pay phone and was abducted from the gas station before the rape. She said that the black male who had abducted her took her to a house, at which there was another black man. The abductor then took $189 from her purse, went to the other black male, bought cocaine from him, and forced the complainant to smoke the cocaine and have sex with him several times. She told Officer Patterson that she was raped several times and kept in the defendant's house. She gave the officer an accurate description of the defendant's house and told him that one could see the lights of the Concord Commons from his house. She gave him enough information so that Patterson could locate the defendant's house. She told Patterson about a gun. The complainant gave an accurate description of the

defendant: deep voice, dark-complected, and having gray hairs in his goatee.

The complainant also talked to Officer Pobjecky on November 4, 1991. She testified at trial that she related to both Patterson on October 25 and Pobjecky on November 4 that (1) the man who raped her said he would kill her; (2) she had been thrown on the bed; (3) the defendant grabbed a gun and pointed it at her; (4) she had been asked about anal sex but that it did not happen; (5) defendant had used a condom; (6) the defendant had touched her face with his hand; (7) if she would not voluntarily look defendant in the eye, he would put his hand on her chin and make her; (8) at some point the defendant fell asleep; and (9) the defendant performed more than one sexual act on her.

When Officer Pobjecky was assigned the case on November 4, 1991, the defendant had already been named as a suspect since his fingerprint had been removed from the complainant's vehicle. On November 4, 1991, Pobjecky interviewed the complainant and she mentioned the defendant's name. Pobjecky then showed her a photo lineup. The complainant immediately picked out the defendant's photo.

Thus, while much of the complainant's story was corroborated, there were admitted discrepancies. Notably, she did not reveal to Patterson that she came into contact with the defendant through her voluntary use of drugs. She testified that her rationale for this was that her relationships with her family members, her job, and her relationship with her boyfriend all would be in jeopardy had they known that she was involved in drugs again. She thought the incident was going to hurt enough without it involving drugs, and thereby damaging these important relationships in her life. She explained that she was very close to her parents and that she and her sister Rhonda were best friends. The complainant and her boyfriend had been dating off and on for four years and had broken up in 1989 because he found out about her cocaine habit, which she had hidden for quite a while. She explained that her boyfriend had no tolerance for drugs.

The complainant testified that she did not make up the rape to cover up the cocaine, but had made up the abduction to cover up the cocaine. Furthermore, when Officer Patterson took her to the neighborhood she had described, the complainant did not take the police directly to the defendant's house. Her rationale for this lack of truthfulness was that she was in the backseat of the car *in* the defendant's neighborhood, she had just gotten away from the defendant, and she was afraid that if she took them directly to the house, she was going

to meet up face to face with him, and at that point she could not do that. She explained that it had been only one-half hour between the time she had last seen the defendant, he had told her to meet him in one hour, and to not be "slick" or he would kill her. She testified that she wanted the defendant to get caught, but was very afraid. The complainant testified that even sitting in the courtroom with the defendant she was not real comfortable.

The defense rested without presenting any evidence. The jury found the defendant guilty of aggravated unlawful restraint and one count of aggravated criminal sexual assault which alleged oral sex, but could not reach a verdict on the second charge of aggravated criminal sexual assault, which alleged an act of vaginal intercourse. This charge was later dismissed and, at sentencing, the court vacated the restraint charge as a lesser included offense of the sexual assault. The court sentenced the defendant to an 18-year term of imprisonment on May 4, 1992.

In the first issue on review, the defendant contends that the jury was not instructed on the fact that an element of aggravated criminal sexual assault is the defendant's use of force or threatened use of force. He argues that because this omission was not harmless, the defendant is entitled to a new trial. The State contends that the jury was properly instructed as to the elements of aggravated criminal sexual assault, as well as the definition of force or threat of force. The State further argues that the issue is waived by the defendant's failure to object to the instruction submitted by it and given by the trial court, by defendant's failure to offer an instruction including this element, and by his failure to raise this issue in his post-trial motion. The State further argues that any error in failing to include this element in the issues instruction was harmless.

The trial court bears the burden of seeing that the jury is instructed on the essential elements of the crime charged, on the presumption of innocence, and on the question of burden of proof. (*People v. Parks* (1976), 65 Ill. 2d 132, 137.) A defendant's failure to object to jury instructions, to offer instructions that correctly state the law, and to raise the issue in a post-trial motion results in the waiver of alleged errors for purposes of appeal. (*People v. Shields* (1991), 143 Ill. 2d 435, 446.) However, plain errors or defects affecting substantial rights may be addressed on appeal although they were not brought to the attention of the trial court. (134 Ill. 2d Rules 451(c), 615(a); *People v. Thurman* (1984), 104 Ill. 2d 326, 329.) Thus, substantial defects in jury instructions in criminal cases may be considered, even though the defendant has failed to make timely objections. This

doctrine is appropriately invoked when the evidence of guilt is closely balanced, or when the error constitutes a grave error. (*People v. Reddick* (1988), 123 Ill. 2d 184, 198.) The failure properly to inform the jury of the elements of the crime charged has been held to be error so grave and fundamental that the waiver rule should not apply. (*People v. Ogunsola* (1981), 87 Ill. 2d 216, 222.) It is essential to a fair trial that the jury not be permitted to decide a defendant's guilt or innocence of a crime without being told the essential characteristics of that crime. (*Ogunsola*, 87 Ill. 2d at 222.) Here, the defendant argues that an essential element of the crime of aggravated criminal sexual assault is that the defendant used force or threatened the use of force and that the jury in this case was not so instructed.

The use of force or the threatened use of force is an essential element of aggravated criminal sexual assault. (Ill. Rev. Stat. 1991, ch. 38, par. 12—14 (now 720 ILCS 5/12—14 (West 1992)).) In the present case, in order to prove the defendant guilty beyond a reasonable doubt of aggravated criminal sexual assault, the jury needed to find:

> "First: That the defendant committed an act of sexual penetration upon _____; and
>
> ***
>
> Second: That the act was committed by the use of force or threat of force[, and that _____ did not consent to the act of sexual penetration]; and
>
> ***
>
> Third: That the defendant [(displayed) (threatened to use) (used)] [(a dangerous weapon) (any object fashioned or utilized in such a manner as to lead the victim under the circumstances reasonably to be believe it to be a dangerous weapon)].
>
> * * *
>
> If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.
>
> If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty." (Illinois Pattern Jury Instructions, Criminal, No. 11.34 (2d ed. Supp. 1989) (hereinafter IPI Criminal 2d No. 11.34 (Supp. 1989)).)

However, in the present case, the jury was instructed:

> "To sustain the charge of aggravated criminal sexual assault, the State must prove the following propositions:

First: That the defendant committed an act of sexual penetration upon complainant; and

Second: That the defendant displayed a dangerous weapon.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

On the basis of this instruction, the defendant contends that an element of the offense of aggravated criminal sexual assault was omitted from the jury instructions.

The jury was also instructed:

"A person commits the offense of aggravated criminal sexual assault when he:

1. commits criminal sexual assault; and

2. displays or threatens to use a dangerous weapon."

Further instructions included:

"A person commits the offense of criminal sexual assault when he commits an act of sexual penetration upon the victim by the use of force or threat of force."

In addition the jury instructions included:

"The term 'Force or threat of force' means the use of force or violence, or the threat of force or violence, including but not limited to when the accused threatens to use force or violence on the victim, and the victim under the circumstances reasonably believed that the accused had the ability to execute that threat."

■ The State argues that all of these instructions together properly instructed the jury on the issue of the elements of the offense. The State cites *People v. Mills* (1968), 40 Ill. 2d 4, 15-16, to stand for the proposition that no single instruction is required to state all of the relevant law on a given subject and when multiple instructions are read together, it may be apparent that the court adequately instructed the jury. We distinguish *Mills* on the basis that in that case the court determined that two instructions were necessary to impart to the jury that the defendant committed the offense of possession of a narcotic drug when it is shown that he *knowingly* has such drugs in his possession. However, in this case, while it may be *gleaned* from the four instructions set forth that the use of force or the threatened use of force is an element of the crime, such a proposition is not readily evident from a reading of these instructions. We thus find the jury in-

14

structions incomplete. Furthermore, standing alone, the elements instruction setting forth expressly what it is that the State must prove is erroneous, as it lacks the element of the use of force or the threatened use of force. IPI Criminal 2d No. 11.34 (Supp. 1989).

For these reasons, we determine that the jury was not properly instructed on the requirement of the element of the use or the threatened use of force in the instructions for the crime of aggravated criminal sexual assault. Furthermore, we find such error to be reversible error. The failure to instruct the jury on an essential element of an offense is reversible error. (*People v. Turner* (1989), 179 Ill. App. 3d 510, 517.) However, error which may have been committed in giving or refusing instructions will not always justify reversal when the evidence of defendant's guilt is so clear and convincing that the jury could not reasonably have found him not guilty. (*People v. Holmes* (1993), 254 Ill. App. 3d 271, 276, citing *People v. Felder* (1992), 224 Ill. App. 3d 744, 755-56.) If evidence of an element of an offense is overwhelming, then its omission from the jury instructions is harmless error. *Holmes*, 254 Ill. App. 3d at 276.

In the present case, the evidence is not so clear and convincing (on the issue of the use or the threatened use of force) that the jury could not reasonably have found the defendant not guilty. We determine this on the basis of the verdicts and the record. In order to find the defendant guilty of aggravated criminal sexual assault, the jury was instructed, as excerpted above, that the State must prove that (1) he committed an act of sexual penetration on complainant; and (2) he displayed a dangerous weapon. Although there was testimony by complainant that he forced her to have intercourse and to have oral sex, that and evidence of her bruises are the only evidence of force present in the record. In addition, apparently the evidence was not overwhelmingly in favor of the defendant's guilt, as the jury found him guilty on only one of two aggravated criminal sexual assault counts. Thus, we gather from the record and the verdicts that the error which occurred did not constitute only harmless error.

In addition, we note that a substantial amount of the evidence introduced at trial was the testimony of the complainant, who was a drug addict and whose testimony must be examined closely. The testimony of a narcotics addict must be scrutinized with caution; her testimony, however, may be sufficient to support a conviction if corroborated by other testimony, or otherwise credible under the surrounding circumstances. (*People v. Lopez* (1989), 187 Ill. App. 3d 999, 1004.) Therefore, we determine that the omission of the element regarding

force from the elements instruction was reversible error, and we remand for a new trial.

Next, the defendant contends that reversible error occurred when he was not permitted to introduce evidence of bias or motive on the part of the complaining witness. He contends that the prosecution's successful motion *in limine* kept out the fact that the complainant was on supervision for deceptive practices at the time of trial. He contends that had she admitted at trial that in fact all of her stories were untrue, her ability to continue on supervision would have been jeopardized. Thus, he contends, she was biased and had a motive to testify falsely that she had been raped. The State asserts that the defendant failed to raise this issue in his post-trial motion and that thus this issue is waived. The defendant does not address the waiver issue in his reply brief.

An issue not preserved in a post-trial motion is waived. (*People v. Lear* (1991), 143 Ill. 2d 138, 145; *People v. Jaffe* (1986), 145 Ill. App. 3d 840, 858.) We agree with the State's contention, and since the defendant does not address the State's argument on waiver, we determine that this issue has been waived.

As a final matter, the defendant argues that he was not proved guilty beyond a reasonable doubt. He argues that the complainant was a drug addict who fabricated versions of her story and thus is not a credible witness. In keeping with the mandate of *People v. Taylor* (1979), 76 Ill. 2d 289, 309, we have reviewed the evidence and find that it was sufficient to support the jury's conclusion that the defendant was guilty beyond a reasonable doubt of aggravated criminal sexual assault. The finding does not constitute in any way an implication as to the defendant's guilt or innocence which would be binding on retrial. Rather, it is intended only to protect the defendant from the risk of being subjected to double jeopardy.

In conclusion, in light of the error made at the trial of this matter, we determine that the decision of the trial court should be reversed, and we remand the cause for a new trial.

Reversed and remanded.

QUETSCH, J., concurs.

JUSTICE COLWELL, dissenting:

I respectfully dissent since I believe that the omission of the element of force in the instruction on aggravated criminal sexual assault

was not reversible error given the overwhelming evidence of guilt in this case.

Here, the trial court properly instructed the jury on the definition of aggravated criminal sexual assault in instruction No. 12, but incorrectly instructed on the issues instruction for aggravated criminal sexual assault in that this instruction should have contained the provision that the act was committed by the use of force or the threat of the use of force. See IPI Criminal 2d No. 11.34 (Supp. 1989).

First, it must be noted that I believe the majority properly reviewed this issue under the plain error doctrine. Those errors fundamental to our system of justice, such as the failure to give an instruction on the burden of proof, the presumption of innocence, or the essential elements of the crime charged implicate the plain error doctrine. (See *People v. Layhew* (1990), 139 Ill. 2d 476, 486; *People v. Ogunsola* (1981), 87 Ill. 2d 216, 222.) Allowing the jury to convict defendant of aggravated criminal sexual assault even if it believed that defendant never used or threatened force on the victim would have deprived defendant of a fair determination of his guilt or innocence in addition to the fact that it " 'deprives the jury of the guidance it must have properly to decide the case.' " *People v. Holmes*, 254 Ill. App. 3d at 278, quoting *Ogunsola*, 87 Ill. 2d at 223.

Further, I do not believe the jury instructions regarding criminal sexual assault, aggravated criminal sexual assault, and the definition of "force" when taken together are adequate to inform the jury properly of the propositions which must be proved for aggravated criminal sexual assault. The committee notes in the IPI under the definition of aggravated criminal sexual assault specifically state that where, as here, the section (a) definition is used, the trial court must then give the appropriate set of propositions contained in the issues instruction for aggravated criminal sexual assault. This includes the provision regarding the use of force or the threat of the use of force.

However, an error in giving or refusing instructions will not always justify reversal when the evidence of defendant's guilt is so clear and convincing that the jury could not reasonably have found him not guilty; indeed, if evidence of an element of an offense is overwhelming, then its omission from the jury instructions is harmless error. (*Holmes*, 254 Ill. App. 3d at 276.) The majority concludes that the evidence in this case is not clear and convincing that the defendant used force or threatened the use of force. I believe the record shows otherwise. The majority states that the complainant's testimony that he forced her to have intercourse and oral sex and evidence of her bruises are the only evidence of force present in the record. I believe

complainant's testimony, notwithstanding her drug addiction, is otherwise credible under the surrounding circumstances and conclude such evidence overwhelmingly proves force or the threat of force. (See *People v. Lopez* (1989), 187 Ill. App. 3d 999, 1004.) In fact, the record as a whole is undisputed that defendant used force and threatened the use of force during the hours he assaulted complainant.

The complainant testified that defendant grabbed her from the kitchen area of his house and dragged her into the attic bedroom. He forcibly picked her up and put her onto the bed after she refused to get on the bed herself. He had complainant take her clothes off at gunpoint and threatened to kill her more than once during the morning. Complainant testified that defendant forced her to engage in vaginal intercourse more than once. He held her head down to perform oral sex on him. Complainant testified she sustained bruises to her arms, back, and buttocks, which was substantiated by the pictures submitted as evidence at trial showing severe bruises to both her upper arms. I believe the evidence of defendant's guilt is so overwhelming that the plain error exception to the waiver rule does not apply. Defendant's case was not so close factually that fundamental fairness requires reversal. See *People v. Jones* (1979), 81 Ill. 3d 1, 9; *Holmes*, 254 Ill. App. 3d 271; *People v. Felder* (1992), 224 Ill. App. 3d 744, 755-56.

I further take issue with the majority's conclusion that "apparently the evidence was not overwhelmingly in favor of the defendant's guilt, as the jury found him guilty on only one of two aggravated criminal sexual assault counts." (252 Ill. App. 3d at 14.) I disagree with the assumption here that because the jury did not find defendant guilty of one count of aggravated criminal sexual assault, the evidence of the other aggravated criminal sexual assault count on which he was convicted was not overwhelming. An acquittal on one count of a multicount indictment should not affect a simultaneous conviction. (*People v. Dawson* (1975), 60 Ill. 2d 278.) If the rule were otherwise, " 'the Government would be entitled to have the jury warned that an acquittal on some counts might undermine a guilty verdict on others— almost the opposite of the standard instruction.' " *Dawson*, 60 Ill. 2d at 281, quoting *United States v. Carbone* (2d Cir. 1967), 378 F.2d 420, 422-23.

Clearly, the majority here is not suggesting that dismissal of the one count of aggravated criminal sexual assault renders the conviction of the other count suspect; rather, it concludes that the jury's failure to find defendant guilty on the one count means we cannot presume that the jury inferred that defendant used force or threatened to use

force during these events. While this may be true, I do not believe that the dismissal of one aggravated criminal sexual assault count here allows us to conclude, as does the majority, that the evidence in the other such count was closely balanced so as to require a reversal. The jury found defendant guilty of aggravated criminal sexual assault involving oral penetration but could not reach a verdict on the charge involving vaginal penetration, and this charge was later dismissed. These counts constitute different acts, and the jury could have reached contrasting conclusions on them for any number of reasons. Accordingly, I would affirm the circuit court of Winnebago County.