# Illinois Official Reports

## Appellate Court

<div style="border:1px solid black;">

### *People v. Luellen*, 2019 IL App (1st) 172019

</div>

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LARRY LUELLEN, Defendant-Appellant. |
| District & No. | First District, First Division<br>No. 1-17-2019 |
| Filed | November 25, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CR-06293(01); the Hon. Arthur F. Hill Jr., Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Stephen L. Richards, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Annette Collins, and Janet C. Mahoney, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HYMAN delivered the judgment of the court, with opinion.<br>Justices Pierce and Walker concurred in the judgment and opinion. |

¶ 1 A jury found Larry Luellen guilty of first degree murder for the shooting death of Frances Colon. The State's principal witness, Bilal Sulieman, testified that he came to court in the custody of the Cook County Sheriff because he had ignored the subpoena for his attendance out of fear of Luellen. After Sulieman's testimony, the jury sent the judge three notes expressing fear for their own safety. Luellen moved for a mistrial, and after individually questioning the jurors, the trial court excused one juror for cause and denied Luellen's motion. The trial court sentenced Luellen to 75 years' imprisonment.

¶ 2 On appeal, Luellen raises three arguments: (i) the trial court erred by denying Luellen's motion for a mistrial and by inadequately inquiring into a series of jury notes, which suggest that the jury had begun discussing the case prematurely; (ii) the trial court erred by overruling objections to the State's successful attempt to elicit evidence that Sulieman feared Luellen and his friends; and (iii) regardless of any trial error, the State failed to prove Luellen guilty of first degree murder beyond a reasonable doubt because Sulieman, the only witness to identify Luellen, was not a reliable witness.

¶ 3 We disagree with all of Luellen's arguments and affirm. The jury's notes did not jeopardize Sulieman's right to a fair trial. Even had there been evidence of some premature deliberation, the trial court took adequate measures to protect against any bias potentially caused by Sulieman's testimony that he feared Luellen. Next, the substance of Sulieman's testimony about his fear of Luellen explains his appearance in a Cook County Department of Corrections uniform, particularly where Luellen's counsel made a pointed comment about Sulieman's initial failure to appear in opening statements. Finally, Sulieman, who knew Luellen for years, saw his face twice from a close distance in lit conditions, allowing him to make a credible identification.

¶ 4 Background

¶ 5 Faras Abdelhadi was working at his uncle's liquor store, when he went to get something to eat. As he walked, he saw an argument taking place in front of DJ's restaurant. Abdelhadi recognized the two men involved in the argument as "Boo" (Luellen) and "T-Y" (Darius Hammond). Abdelhadi stood about two feet away from Luellen and Hammond. In the time that Abdelhadi observed the argument, he did not hear either man threaten to kill anyone or see either with a weapon. Abdelhadi disclosed that he had an issue with his left eye, which affected his ability to see long distances and to obtain a driver's license.

¶ 6 Abdelhadi knew Luellen because Luellen worked at the barbershop that Abdelhadi used to frequent. Abdelhadi also saw Luellen around the neighborhood about every other day for the past five to six years.

¶ 7 Abdelhadi knew Hammond as a customer of his uncle's liquor store. Abdelhadi saw Hammond every other day for the past 8 to 10 years.

¶ 8 About 10 to 15 minutes after Abdelhadi returned to the liquor store, he heard gunshots. Abdelhadi learned that someone had been shot.

¶ 9 A few days later, detectives asked Abdelhadi to view a photo lineup and showed Abdelhadi a group of six photographs, from which he recognized and identified Luellen. Shortly

afterwards, Abdelhadi returned to the police station, where detectives showed him another group of six photographs, from which he recognized and identified Hammond.

¶ 10    Following Abdelhadi's testimony, the trial court instructed the jury to "not discuss the case amongst yourselves or anyone else. Do not let anyone discuss it with you."

¶ 11    The State then called Bilal Sulieman. Defense counsel had warned the jury in opening statements that "there is one witness in this case, a witness who had to be arrested and is going to come out in Cook County Department of Corrections clothing, and here—and his name is Bilal Sulieman, write it down and hold me to it." At the time Sulieman testified, he was in the custody of the Cook County Department of Corrections for ignoring a subpoena to appear at the trial. The State asked Sulieman to tell the jury why he was in custody. Sulieman explained that he had failed to obey the subpoena. The State then asked why he did not come to court, and Sulieman responded, "I was just scared of testifying against the defendant because they know where I was working at." Luellen's counsel objected to Sulieman's characterization "they know" unless Sulieman could provide a basis for that concern. The trial court sustained counsel's objection.

¶ 12    Sulieman had worked at his brother's cell phone and clothing store for about two years. He continued working there until around 2015. He knew Luellen as a customer and saw him two to three times a week.

¶ 13    The State then asked, "And you indicated that you were scared to come to court, correct?" Sulieman began to respond when defense counsel objected. The trial court overruled the objection, and Sulieman finished answering that "[Luellen] and his friends all knew that I worked over there, so I didn't want it to come back that I was the one talking and coming to the store and doing something to me."

¶ 14    Sulieman also knew Hammond. For three to four months before the shooting, Hammond would visit the store two to three times a week.

¶ 15    On the evening of the shooting, Sulieman walked outside the store to smoke a cigarette. Within 30 seconds, he saw Hammond run past him, and Luellen follow 5 to 10 steps behind. They were running from the direction of DJ's Restaurant. When Hammond and Luellen first ran past Sulieman, they were both less than two to three feet away from him. Hammond wore a gray hoody, had nothing covering his face, and had nothing in his hands. Luellen wore a black hoody and had his right hand in the hoody's pocket holding onto something.

¶ 16    As Hammond ran diagonally across the street, Sulieman saw Luellen stop running in front of a park, pull his right hand out of the pocket of the hoody, and point his arm in Hammond's direction. As Sulieman saw Luellen with his arm outstretched, he heard five to seven gunshots. Sulieman could not see Luellen's hand or the flash of a gun because, when he heard the shots, Luellen had his back toward him. Sulieman did not see anyone else with a handgun or a weapon.

¶ 17    After Sulieman heard the gunshots, Luellen turned around, ran back to where he came from, and, as he passed Sulieman, slowed down and looked right at him. Sulieman saw Luellen's face; two to three feet separated them. Sulieman explained that although it was dark, business lights, streetlights, and car lights lit the busy intersection so that there was "still a lot of light out there. You could still see." Sulieman had been outside for 30 seconds before he saw Luellen and Hammond running. The time from when he first saw Luellen and Hammond until they were out of his sight unfolded in about two to three minutes.

¶ 18    Days afterwards, Detectives Anthony Green and Michael Landando questioned Sulieman about the night of the shooting. Sulieman reviewed and signed a photo lineup advisory form. The detectives showed Sulieman a photo array of six individuals. Sulieman identified Luellen.

¶ 19    Sulieman also met with Detectives Green and Timothy O'Brien at the Area North Chicago police station. Before viewing a lineup of five people, Sulieman reviewed and signed a lineup advisory form. Sulieman identified Luellen as the shooter. Sulieman then spoke to Assistant State's Attorney Jackie Lantz. She showed Sulieman two photos. Sulieman again identified Luellen and identified Hammond as the person at whom Luellen was aiming.

¶ 20    At trial, the State played video footage for the jury from a police camera on a traffic light that showed Luellen running after Hammond from Division Street down Pulaski Road. The record does not contain the video.

¶ 21    When Sulieman finished testifying, the trial court took a break and instructed the jury, "Do not discuss the case amongst yourselves or anyone else. Don't let anyone else—don't discuss this case with anyone, don't let anyone discuss it with you."

¶ 22    Shortly thereafter, the deputy delivered to the judge a note from the jury. The judge read the note into the record: "If the primary witness is so scared to testify that he dismissed the subpoena, what are the safety concerns for us? We are concerned." The trial court noted, "It's not signed, it doesn't say which juror wrote this or how many jurors ascribe to this feeling, but this is what they wrote."

¶ 23    The State took no position on the note. Luellen's counsel suggested three alternatives: (i) tell the jurors that neither party had the juror's addresses, no one can access the jury cards, and their safety is assured by all the means that the court can take; (ii) conduct individual *voir dire* to determine which juror wrote the note, whether each juror shares the concern, and whether the concern prevents the jurors from giving both sides a fair and impartial trial; or (iii) strike all of the testimony about Sulieman's fears.

¶ 24    The trial court declined to conduct an individual *voir dire* so as not to single out an individual juror. Instead, the court brought out the jury and explained that the trial court possessed the juror cards and the information on the cards is not shared with anyone. The court assured the jurors of the paramountcy of their safety and asked them to raise their hands if they felt they could not give both sides a fair trial. No hands were raised.

¶ 25    The trial continued. Jacarri Williams testified that he was walking near Sulieman's store. A girl, who we now know was Frances Colon, was walking toward him. He heard a loud bang and looked behind him. He saw nothing. He heard more bangs and saw Colon, who was just a couple feet in front of him, fall to the ground. Colon was bleeding. He looked to his right and saw people running from across the street.

¶ 26    People started to scatter. Williams saw a man dressed in black standing near the alley on the other side of the street shooting at somebody. Williams could not identify the shooter but saw "fire coming from [the man's] hand, like flames from a gun." Williams ran away from the shooter to the first gangway on his left and hopped a gate. In the process, he dropped his cell phone. When he hopped the gate, he saw Hammond, whom he knew, following him. Williams did not see anything in Hammond's hands. After hopping the gate, Williams ran to the left; Hammond ran to the right. Williams then returned to the scene and told officers what happened and that he dropped his cell phone there.

- 4 -

¶ 27    After Williams's testimony, the trial court took another break. Again, the trial court told the jury, "Don't discuss this case amongst yourselves or anyone else. Don't let anyone discuss it with you."

¶ 28    The jury left the courtroom and sent another note: "The judge said that our information is confidential. My concern is that the defendant has all our names on paper." The State, again, took no position. Luellen's counsel again asked for an individual *voir dire* of each juror to determine whether he or she could give both sides a fair trial. Alternatively, defense counsel asked for a mistrial. The judge took the note under advisement and adjourned for the day.

¶ 29    The next morning, while the jurors waited in the jury room, the court put on the record that the deputies delivered a third handwritten note: "Can the judge just talk to the jurors regarding the question from yesterday? I don't know the protocol, but we would like to keep it private." The note was signed, "[T.L.], the foreman." This concerned Luellen's counsel because the jury had not yet been instructed to choose a foreperson. According to Luellen's counsel, the selection of a foreperson showed that the jury might have been deliberating before they had heard all of the evidence. The following exchange, in relevant part, took place:

"COUNSEL: So if [Y]our Honor does do the individual *voir dire*, which, again, we're wholly in agreement with, I think questions such as—delicate questions about whether they have obeyed the instruction not to be begin deliberations or discuss the case among themselves would be helpful.

COURT: I disagree completely, and I will tell you why. That gets into the longstanding line of cases regarding impeachment of juror verdicts. And the longstanding line of cases regarding juror misconduct. It just so happens on *People v. Travis Kajuana* (phonetic), a case that's pending before me right now, I'm wrestling with that issue, and I have done a lot of research on that. That will not be asked.

I take the foreperson designation here in this last note as merely just a spokesperson. I think it doesn't mean anything more than that, but you have made your record.

* * *

COURT: Regarding the issue about juror safety, their concerns, are there any specific questions that you want this court to ask? Defense?

COUNSEL: Well we would want—we would want you to ask questions after you give them whatever information you want to give them about juror safety, and we will leave that up to you. The question we would like you to ask them is there a specific reason for them asking the question. And if the reason involved any evidence presented, can they give both sides a fair and impartial trial."

¶ 30    The trial court then conducted an individual *voir dire*, asking each juror whether he or she could give both sides a fair trial. Every juror, except for one, said he or she could still be fair. Juror J.N. said that it was not a "yes" or "no" answer and he would do his best to be fair but found it difficult to say for sure because "[w]e're all sitting here talking about personal information, and we weren't really involved in any of this obviously. I don't know how to answer that. It all depends on what else we hear and what comes out." The trial court excused juror J.N. for cause and replaced him with an alternate. The trial court then denied the motion for a mistrial but instructed the jury to disregard Sulieman's testimony about why he had not come to court.

¶ 31        After deliberating, the jury found Luellen guilty of first degree murder. Luellen filed a motion for a new trial, which the trial court denied. Luellen received a sentence of 75 years in the Department of Corrections.

¶ 32                                              Analysis

¶ 33        Luellen makes three arguments challenging the judgment: (i) the trial court erred by denying Luellen's motion for a mistrial and by failing adequately to inquire into a series of jury notes, which Luellen argues indicated that the jury had prematurely discussed the case; (ii) the trial court erred by overruling objections to the State's successful attempt to elicit evidence that Sulieman feared Luellen and his friends; and (iii) Luellen has not been proved guilty of first degree murder beyond a reasonable doubt because Sulieman's identification was vague and doubtful.

¶ 34                                          Juror Questions

¶ 35        We begin by addressing the issue that Luellen focused on at oral argument and that, to us, poses the closest question of the three issues Luellen presents. Luellen claims that the information from Sulieman's testimony—that he was afraid of Luellen—led to improper jury deliberations before the close of evidence. Luellen argues that the trial court committed a legal error when it declined to specifically ask the jurors whether they had begun deliberating. He asks us to reverse the trial court's denial of his motion for a mistrial. The State responds that the court did not need to conduct an inquiry because nothing in the jury's notes or the individual *voir dire* indicated that they had begun to discuss the facts or were incapable of being fair and impartial.

¶ 36        A trial court should grant a mistrial "where an error of such gravity has occurred that it has infected the fundamental fairness of the trial, such that continuation of the proceeding would defeat the ends of justice." *People v. Bishop*, 218 Ill. 2d 232, 251 (2006). Trial before a biased jury would amount to a structural error if it occurred. *People v. Runge*, 234 Ill. 2d 68, 102 (2009). The determination of whether a jury has been irrecoverably compromised by interjuror communications "rest[s] in sound judicial discretion." *Id.* at 104. The court's discretion also extends to the initial decision about whether and how to ask jurors about possible bias. *Id.* at 105. We review both the trial court's determination about possible juror bias and the trial court's decision to deny Luellen's motion for a mistrial for an abuse of discretion. *Id.* (juror bias); *Bishop*, 218 Ill. 2d at 251 (denial of mistrial).

¶ 37        Luellen primarily contends that the trial court abused its discretion by failing to exercise it. He points to the trial court's exchange with Luellen's counsel on dealing with the jury notes:

        "That gets into the longstanding line of cases regarding impeachment of juror verdicts. And the longstanding line of cases regarding juror misconduct. It just so happens on *People v. Travis Kajuana* (phonetic), a case that's pending before me right now, I'm wrestling with that issue, and I have done a lot of research on that. That will not be asked."

In Luellen's view, the trial court believed it could not, as a matter of law, ask the jurors about whether they had disobeyed the court's instructions and begun to deliberate prematurely. A simple reading of the exchange indicates that Luellen's interpretation does not add up.

¶ 38     A trial court abuses its discretion where "it fails to understand it has discretion to act or wholly fails to exercise its discretion." *People v. Lovelace*, 2018 IL App (4th) 170401, ¶ 33. In his brief and again at oral argument, counsel focused on what he believed to be the trial court's expression of a lack of legal authority to ask about deliberations because doing so would raise concerns about "impeachment of juror verdicts." We find the trial court's (and the parties') focus on the impeachment of verdicts to be quite beside the point. The common-law no-impeachment rule grew out of a desire to prevent jurors from testifying about their deliberative processes *after* the verdict was entered. *Peña-Rodriguez v. Colorado*, 580 U.S. ___, ___, 137 S. Ct. 855, 863 (2017). Here, of course, there was not yet a verdict and so nothing to impeach. See *id.* at ___, 137 S. Ct. at 866 (noting wider availability during trial for the parties to learn of misconduct or jurors to report it). We accept, without deciding, that the trial court could have asked virtually anything it felt appropriate to resolve the issue raised in the jury note.

¶ 39     Moreover, the heart of the matter is not what the trial court could have done; it is what the trial court did. We would confront an altogether different question if the trial court had made the statement about the no-impeachment rule and then said or done nothing else. But the trial court eventually conducted an individual *voir dire* of each juror, albeit without asking the specific question advocated for by Luellen's counsel. Our supreme court has explained that, even where juror questions potentially open up the jury's conversations to scrutiny, we must still decide on the sufficiency of the trial court's ultimate response. *Cf. People v. Downs*, 2015 IL 117934, ¶ 28 ("even if defendant were correct that courts could properly view jury questions as a key to the jury's actual deliberations, the issue of the proper response to the jury's question would remain"). In other words, we focus on the course of action that the trial court ultimately took to evaluate its propriety.

¶ 40     The trial court conducted an individual *voir dire* of each of the jurors, asking each juror if he or she could be fair to both sides. Only one juror, J.N., said "[i]t's not a yes or no answer" and that it would be "hard to say" because of Sulieman's testimony about his fear of Luellen. The court excused that juror for cause. Otherwise, all jurors affirmatively indicated that they could remain fair notwithstanding Sulieman's testimony.

¶ 41     To the extent that Luellen argues the trial court's remedial measures were deficient, *Runge* precludes us from agreeing. In *Runge*, after finding one juror to be biased and excusing that juror, the trial court asked the remaining jurors if they were still able to comply with the trial court's directive "that they were not to arrive at any decisions or conclusions until they had heard all the evidence." *Runge*, 234 Ill. 2d at 126-28. The court found that the jurors were "well instructed" and that no reason existed to disbelieve the remaining jurors' assertions that they could keep an open mind once the single biased juror had been dismissed. *Id.* at 131. Here too the careful trial judge "well instructed" the jurors, and nothing in the record or notes suggest premature discussion of the merits.

¶ 42     We acknowledge the juror notes revealed that at least some amount of discussion had taken place about a portion of Sulieman's testimony, namely, his fear of Luellen. But those same questions also reveal that the jurors' concerns were not with Sulieman's fear as to the ultimate issue of Luellen's guilt or innocence; they were with Sulieman's fear as it related to the jurors' own privacy. Absent from the record is any indication that jurors' minds had closed off to the possibility of Luellen's innocence or that they had reached an ultimate conclusion. As the court in *Runge* explained, "[w]hat is crucial is not that jurors keep silent with each other about the case but that each juror keep an open mind until the case has been submitted." (Internal

quotation marks omitted.) *Id.* at 125 (quoting *Davis v. Woodford*, 384 F.3d 628, 653 (9th Cir. 2003)). To that end, "some indication of occasional and isolated discussions in the jury room" does not always require remedial action. *Id.* at 129.

¶ 43    So far, our discussion has presumed actual evidence of premature deliberation as opposed to the errant concerns of a single skittish juror. But, not only are the jury notes silent on possible discussion of the ultimate issues, the record shows that any fear of Luellen based on Sulieman's testimony may have been limited to one person. The first note used third-person language like "we" and "us," but the trial court found it unclear as to who wrote it and the number of jurors whose opinion it represented. The second note, sent out after Williams's testimony, was written in the first person and used the language, "[m]y concern." The third note merely asked the court to address "the question from yesterday," which, again, appeared to reflect the concern of only one juror. Then, as we have already explained, during the trial court's individual *voir dire* only one juror expressed hesitancy about being fair and that juror was excluded. Reading the record holistically, it was not an abuse of discretion for the trial court to decline counsel's preferred question where the record indicates that the jury sent out its notes to placate a single juror.

¶ 44    Additionally, the trial court admonished the jurors at numerous points throughout the trial that they were not to discuss the case until they heard all of the evidence. Immediately before *voir dire*, the trial court advised the *venire*: "a juror would have to wait to make up their mind on the case until after they have heard and seen all the evidence, heard the arguments of counsel and received the law after the close of this case. If you cannot and will not follow that rule, please raise your hand. No one has raised their hand." During a break for lunch after Abdelhadi's testimony, the court told the jurors: "Do not discuss the case amongst yourselves or anyone else. Do not let anyone discuss it with you." The court gave a nearly verbatim instruction immediately before a break after Sulieman's testimony. After Jacarri Williams's testimony and before breaking for the day, the court gave another admonishment nearly identical to the previous two. In total, the trial court instructed the jury 10 times not to deliberate before the completion of the evidence. To repeat, the jury notes are bereft of any implication that the jurors had "ma[d]e up their mind on the case" in violation of the court's admonishments.

¶ 45    We also do not find that one note's reference to a "foreperson" points to premature deliberation. Five of the jurors and both alternates had served on juries. Three additional jurors had experienced *voir dire*. In total, 10 of the 14 jurors (including alternates) had experience with the legal system that could have reasonably exposed them to the concept of selecting a foreperson to communicate with the court.

¶ 46    While not directly relevant to the court's considerations in *Runge*, we add our observation that the trial court ended up striking the only portion of testimony that the jury appears to have discussed. Just before one of the breaks, the court told the jury: "The portion of the witness Mr. Sulieman who talked about the reason why he was afraid, didn't come to court and didn't obey the subpoena and then he gave a reason, I'm striking that portion of his testimony." The trial court eliminated the only evidence about which the jury notes indicate any possible premature discussion. Considering the entirety of the record, we conclude, as the court did in *Runge*, that the trial court well instructed the jury not to prematurely deliberate and each juror reaffirmed his or her ability to be fair after the dismissal of juror J.N. We cannot say the trial

court's remedial measures on receiving the jury notes constituted an abuse of discretion.

¶ 47                                    Evidence of Sulieman's Fear

¶ 48     Luellen argues that we should remand for a new trial because the State elicited testimony from Sulieman that he feared Luellen and the trial court erred in overruling objections to these questions. According to Luellen, he established prejudice because one juror (who would eventually be excused for cause) indicated that he was afraid and the testimony prompted other jurors to prematurely begin deliberations. The State responds that its line of questioning was proper and, even if improper, Luellen's counsel invited the error.

¶ 49     Reviewing the trial court's admission of evidence for an abuse of discretion (*People v. Reese*, 2017 IL 120011, ¶ 75), we agree with the State. We find no error in the prosecutor's questioning of Sulieman, and even if we did, we agree with the State that Luellen's counsel invited it.

¶ 50     Luellen relies on a trio of cases: *People v. Mullen*, 141 Ill. 2d 394 (1990); *People v. Fluker*, 318 Ill. App. 3d 193 (2000); and *People v. Ray*, 126 Ill. App. 3d 656 (1984). Unlike here, each of these cases involved the State's attempt to introduce a witness's fear of a defendant during *argument* without first presenting evidence of that fear through testimony. *Mullen*, 141 Ill. 2d at 405 ("[p]rosecutorial comments which suggest that witnesses were afraid to testify because defendant had threatened or intimidated them, *when not based upon any evidence in the record* *** are highly prejudicial and inflammatory" (emphasis added and internal quotation marks omitted)); *Fluker*, 318 Ill. App. 3d at 203-04; *Ray*, 126 Ill. App. 3d at 662. Indeed, one of the cases that *Mullen* cites expressly approves of prosecutorial comments on a witness's fear of the defendant as long as the State presented evidence to support those comments. *People v. Hynes*, 26 Ill. 2d 472, 476 (1962).

¶ 51     We do not have to determine whether the State stretched the limits of argument—the State made not a single mention of Sulieman being afraid of Luellen during its closing. As to the trial court's admission of the evidence of Sulieman's fear, we have held that "[e]vidence of the fears of witnesses is relevant and admissible *** where it tends to prove a material fact in issue and its probative value outweighs its prejudicial effect." *People v. Felder*, 224 Ill. App. 3d 744, 757 (1992). Those considerations are satisfied.

¶ 52     For example, in *Felder* we found a witness's testimony that "she was fearful that defendant and [his friend] would be able to again 'get to' her" relevant to explain why she initially failed to cooperate with the police. *Id.* We found a lack of prejudice, focusing on the witness's testimony speaking nothing more than a generalized fear of the defendant and not implying that the defendant had "in any manner threatened [the witness]." *Id.* Similarly, Sulieman did not testify that Luellen or his associates had made any specific threat towards him; he knew Luellen, and that made him afraid to testify.

¶ 53     We also have approved the admission of testimony about a witness's fear of the defendant where that testimony contains information with a much higher potential to be prejudicial. In *People v. Dixon*, 378 Ill. App. 3d 535, 538 (2007), one of the witnesses testified that he was scared for his safety because "a gang called the 'Traveling Vice Lords' had put the word out on the street that if [the witness] testified in court, the gang would retaliate." That same witness then testified that the defendant belonged to the Traveling Vice Lords. *Id.* We found even highly inflammatory gang-related evidence admissible when used "to explain why trial witnesses recanted their grand jury testimony and testified differently at trial." *Id.*

¶ 54    The State's questioning of Sulieman, by contrast, stayed away from offering extraneous detail that might have prejudiced the jury against him. The only information we learned about Sulieman's relationship with Luellen involved Luellen's frequenting, two to three times a week for about two years, the store where Sulieman worked. And, the only reason Sulieman said he feared Luellen and his friends had to do with them "all [knowing] that [Sulieman] worked over there so [Sulieman] didn't want it to come back that [he] was the one talking." The record has no inflammatory testimony about Luellen, unlike in *Dixon*, and no testimony about a specific threat Luellen made to Sulieman, as in *Felder*. In other words, the State only elicited enough information to explain Sulieman's decision to ignore a subpoena.

¶ 55    Sulieman's subpoena evasion gives his testimony about his fear of Luellen its probative value. In an ordinary case, where a witness voluntarily appears in court in street clothes, the State may cross the line by *sua sponte* attempting to elicit testimony about that witness's fear of the defendant. This is not the situation here. The State confronted a potential credibility problem—Sulieman testified while in the custody of the Cook County Department of Corrections. Without an explanation, the jury may have been more inclined to disbelieve Sulieman's testimony. And, disbelieving Sulieman's testimony would have been no small concern for the State, as he served as the only witness identifying Luellen as the shooter.

¶ 56    But the State had even more reason to elicit testimony about Sulieman's fear than the mere fact of his custodial status. Luellen's counsel, during opening argument, attempted to diminish Sulieman's credibility: "There is one witness in this case, a witness who had to be arrested and is going to come out in Cook County Department of Corrections clothing *** and his name is Bilal Sulieman." Defense counsel may put the credibility of the State's witnesses at issue, but counsel cannot then complain that the State took reasonable measures to rehabilitate its witness. *People v. Scott*, 148 Ill. 2d 479, 531 (1992) ("Defendant may not be heard to complain of errors which he injected into his own trial."); see also *People v. Topps*, 293 Ill. App. 3d 39, 48 (1997) (collecting cases). Even if Sulieman's credibility was not inherently at issue by virtue of his incarceration, Luellen's counsel placed it at issue in both opening statements and closing arguments. We do not find error in the admission of Sulieman's testimony about his fear of Luellen and, even if we had, any error would have been invited by defense counsel.

¶ 57                    Reasonable Doubt Argument

¶ 58    A challenge to a criminal conviction based on the sufficiency of the evidence asks whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." (Emphasis added.) *People v. Lloyd*, 2013 IL 113510, ¶ 42. We must view all reasonable inferences in the record in favor of the prosecution and will only reverse if the evidence is so improbable, unsatisfactory, or inconclusive as to establish a reasonable doubt of Luellen's guilt. *Id.*

¶ 59    To determine the reliability of eyewitness identifications, we look to the totality of the circumstances and consider five factors: (1) the witness's opportunity to observe the offender at the scene, (2) the witness's level of attention at the time of the crime, (3) the accuracy of prior descriptions, (4) the witness's level of certainty at the identification confrontation, and (5) the time between the crime and confrontation. *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). Illinois courts have added a sixth factor, acquaintance with the offender before the crime. *People v. McTush*, 81 Ill. 2d 513, 521 (1980); *In re J.J.*, 2016 IL App (1st) 160379,

¶¶ 23, 38 (lack of prior acquaintance makes victim less likely to be able to accurately identify perpetrator).

¶ 60    Luellen argues that the *Biggers* factors compel the conclusion that Sulieman's identification was so vague and doubtful as to constitute reasonable doubt of Luellen's guilt. We disagree.

¶ 61                                    *Opportunity to Observe*

¶ 62    Luellen argues that Sulieman did not have a sufficient opportunity to view the face of the shooter. When considering this factor, we must examine "whether the witness was close enough to the accused for a sufficient period of time under conditions adequate for observation." (Internal quotation marks omitted.) *People v. Tomei*, 2013 IL App (1st) 112632, ¶ 40.

¶ 63    Sulieman had two opportunities to observe Luellen. The first was as Luellen ran past him in pursuit of Hammond. The second was after the gunshots had been fired, when Luellen slowly walked past him while looking directly at him, giving Sulieman even more time to identify Luellen. During both encounters, Sulieman stood within two to three feet of Luellen—close enough for Sulieman to adequately identify Luellen, especially given that Sulieman knew Luellen. And, although it was dark, business lights, streetlights, and car lights lit the intersection, which gave Sulieman the ability to make a proper identification.

¶ 64    Notably, the Illinois Supreme Court has upheld identifications made after viewing the offender for less time and under worse lighting conditions. *E.g.*, *People v. Herrett*, 137 Ill. 2d 195, 200 (1990) (approving jury's acceptance of eyewitness identification where victim had a "few seconds" to view offender in "dim" lighting).

¶ 65    Given that Sulieman twice saw Luellen in close proximity and in adequate lighting, we find that the first *Biggers* factor strongly weighs in favor of the reliability of the identification. "A positive identification by a single witness with ample opportunity to observe is sufficient to support a conviction ***." *People v. Tate*, 87 Ill. 2d 134, 148 (1981).

¶ 66                                    *Degree of Attention*

¶ 67    Luellen argues that Sulieman paid insufficient attention to the shooter's identity. He claims Sulieman looked at two people running past him and testified a number of times that he concentrated on the bulge in the shooter's hoody and the shooter's hand, which he perceived to be holding a gun. Luellen also relies on "weapons focus," the idea that the presence of weapons impairs eyewitness memory and identification accuracy.

¶ 68    The evidence shows that Sulieman's degree of attention at the time of the crime supports the reliability of his identification. Other witnesses, including Jacarri Williams and Faras Abdelhadi, corroborated Sulieman's account as well as video evidence taken from the police camera on a nearby traffic light.

¶ 69    Sulieman did not simply look at two people running past him—Sulieman watched as two people that he had known for a significant period of time ran past him at close proximity. Further, Sulieman did not testify that he concentrated on the bulge in Luellen's hoody or Luellen's hand. Sulieman did state that he noticed a bulge, but nothing in his testimony suggests the bulge distracted him from his identification.

¶ 70 None of the cases cited by Luellen regarding "weapons focus" are Illinois decisions, and most involve factually dissimilar situations. In *People v. Cornwell*, 117 P.3d 622 (Cal. 2005); *Campbell v. People*, 814 P.2d 1 (Colo. 1991); *Garden v. State*, 815 A.2d 327 (Del. 2003); and *United States v. Brownlee*, 454 F.3d 131 (3d Cir. 2006)—four of the six cases—the assailant pointed the weapon at the eyewitness who also happened to be the victim. Sulieman, however, did not have the gun pointed at him, nor was he the victim. See *People v. Middleton*, 2018 IL App (1st) 152040, ¶ 23 (finding identification reliable despite presence of gun; eyewitness was not victim nor had gun pointed at him).

¶ 71 Most importantly, the jury resolves conflicts in the testimony, weighs the evidence, and draws reasonable inferences from the facts. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009). The jury found Sulieman's degree of attention enough to make a reliable identification, and we are not at liberty to disturb its determinations. *Middleton*, 2018 IL App (1st) 152040, ¶ 26. So the evidence leads to Sulieman's level of attention at the time of the crime as high and strongly weighs in favor of the reliability of the identification.

¶ 72                                    *Previous Descriptions*

¶ 73 Luellen questions Sulieman's identification because Sulieman never described the shooter's height, weight, age, clothing, or facial hair. But, as held in *People v. Thompson*, 2016 IL App (1st) 133648, ¶ 37, concern about a witness's physical description of the offenders disappears when the witness knows the suspect. Sulieman knew Luellen and identified him by name to the police. It would have been unnecessary and redundant for Sulieman to give the police a physical description. The absence of an initial description of the offender does not diminish the reliability of Sulieman's identification.

¶ 74                                    *Level of Certainty*

¶ 75 Luellen argues that any certainty shown by Sulieman should not be considered a strong factor weighing in favor of reliability. In support, Luellen argues that, not only did the State not introduce evidence as to Sulieman's degree of certainty, but also two justices of this court have recognized a "lack of correlation between a witness's certainty in his or her identification of someone as the perpetrator of a crime and the accuracy of that identification." (Internal quotation marks omitted.) *People v. Starks*, 2014 IL App (1st) 121169, ¶ 87 (Hyman, J., specially concurring, joined by Pucinski, J.).

¶ 76 We acknowledge the criticisms of the usefulness of a witness's certainty in gauging the reliability of an identification. But we find that this factor weighs neither in favor of nor against a finding of reliability, Sulieman having not been asked about and having not volunteered any description about his certainty. We consider this factor neutral.

¶ 77                     *Time Between the Offense and Identification*

¶ 78 Luellen concedes, and we agree, that the time between the crime and the identification weighs in favor of reliability. Only four days passed between the offense and Sulieman's identification of Luellen in a photo array. We have upheld convictions with longer time between the offense and identification. *E.g.*, *People v. Simmons*, 2016 IL App (1st) 131300, ¶ 97 (approving time gap of up to two weeks). We have no reason to second-guess Luellen's

concession.

*Sulieman's Acquaintance With Luellen*

We find Sulieman's acquaintance with Luellen and Hammond particularly persuasive. Before the shooting, Sulieman saw Luellen two to three times a week for two years. It would be reasonable for a factfinder to infer Sulieman's familiarity with Luellen's appearance and identification of Luellen in circumstances that would be more difficult had Luellen been a stranger. Sulieman had two unobstructed opportunities to view Luellen, a man he knew, as Luellen passed within two to three feet of him on a lit street. Our supreme court has found acquaintanceship instructive where the witness had not known the defendant for nearly as much time or seen the defendant not nearly as often. See *McTush*, 81 Ill. 2d at 523 (informed judgment "inferable from the record that an independent origin for [the witness's] in court identification has been clearly and convincingly established so as to assuage any risk of misidentification").

Accordingly, after considering the evidence in the light most favorable to the State, we find that any rational trier of fact could accept as reliable Sulieman's identification of Luellen as the shooter.

Affirmed.