2024 IL App (1st) 221851-U

FIRST DISTRICT,
FIRST DIVISION
May 20, 2024

No. 1-22-1851

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 16 CR 60140 |
| | ) | |
| DIEGO URIBE, | ) | Honorable |
| | ) | Carol M. Howard, |
| Defendant-Appellant, | ) | Judge Presiding. |

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's failure to use a peremptory challenge to strike a juror after the trial court denied his for-cause challenge waived the issue. The trial court did not err in denying defendant's motion for mistrial based on the court's dismissal of a juror who tested positive for COVID-19.

¶ 2    Following a jury trial in the circuit court of Cook County, defendant Diego Uribe was convicted of the first degree murders of six of his family members and sentenced to a mandatory term of life imprisonment. On appeal, defendant argues that the trial court erred in denying his motion to strike a potential juror for cause. Defendant also challenges the court's denial of his

motion for mistrial after the trial court dismissed a juror who tested positive for COVID-19 and declined to *voir dire* the remaining jurors. For the following reasons, we affirm the judgment of the circuit court.

¶ 3                                    I. BACKGROUND

¶ 4        On February 2, 2016, six members of defendant's family were killed in their home. On June 27, 2016, defendant was charged with the first degree murder of his aunt, Maria Martinez; his uncle, Noe Martinez, Jr.; Maria's mother, Rosauro Martinez; Maria's father, Noe Martinez, Sr.; Maria's 10-year-old son, Alexis Cruz; and Maria's 13-year-old son, Leonardo Cruz. According to the charges, defendant committed the murders during the commission of multiple forcible felonies, by cutting, stabbing, and shooting the victims. Defendant elected to be tried by jury.

¶ 5                                    A. Jury Selection

¶ 6        During jury selection, the trial court questioned the venire in groups of 24. The judge instructed the jurors that two of the six victims were minors and asked whether it would be "difficult for anyone to be fair and impartial just based on the nature of the charges alone?" At one point, the following exchange occurred between the court and a potential juror, Jerry H.:

> "JERRY H.: The crimes against minors, I think I would be biased towards that.
>
> THE COURT: Do you understand that right now, as far as you know, these are allegations and you would have to put all your biases aside and listen to the evidence and make a decision based on the evidence alone? Do you think you could do that?
>
> JERRY H.: I understand that, yeah. But just, like, naturally hearing that, like at first glance, like, just a little bias there. But I understand, like, what's being asked of me.
>
> THE COURT: Thank you."

¶ 7        After questioning the potential jurors individually, the trial court asked the entire group: "Do each of you understand that you may not use sympathy, bias or prejudice in arriving at your decision? If you understand that, you can shake your head up and down indicating yes. If you do

not, you can say no and raise your hand. The record will reflect no one has raised their hand."

¶ 8        Defendant subsequently moved to strike Jerry H. for cause. Defendant argued that Jerry H. "understands what is being asked of him, but *** we would argue that he could not be fair given the fact that he did speak up regarding his feelings regarding charges dealing with minors, and there are two minor victims in this case." The court asked, "Refresh my recollection, didn't he say though that he would try to put it aside and base his decision solely on the evidence?" Defense counsel responded, "We're just noting this for what he said before, the fact that he felt strongly enough to raise his hand and point that fact out regarding charges involving minors." The trial court denied defendant's motion to remove for cause, stating that the juror "seemed to recognize the fact that he would have to put that aside and try to listen to the evidence and base his decision solely on the evidence." The defense did not use a peremptory challenge to remove Jerry H. and he was seated on the jury.

¶ 9                                B. Jury Trial

¶ 10        Codefendant Jafeth Ramos testified against the defendant at trial. The State had offered Ramos a plea agreement whereby, in exchange for her testimony against defendant, her pending murder charges were "reduced to a count of armed robbery *** [a]nd the State [was] recommending" that the court impose a sentence of 25 years in prison. On February 2, 2016, Ramos drove with defendant to the home of his aunt, Maria Martinez, located at 5708 South California Avenue. Defendant told Ramos he was going there to "do a job" and "come back with some money." Defendant also told Ramos that he was "going to kill" Maria, but she "didn't take him seriously." When they arrived, Maria, Noe Martinez, Jr., Rosauro Martinez, Alexis Cruz, and Leonardo Cruz were eating dinner in the dining room.

¶ 11        Leonardo, who was 13 years old at the time, answered the door. Defendant and Ramos entered the home and went upstairs with Maria so defendant could talk to her about "putting away

some money." Upstairs, defendant pulled out a book bag and a gun and demanded Maria "[p]ut all the money" into the bag. Maria laughed and tried to reach for defendant's gun. Defendant said, "I'm not going to tell you again" and threatened to "drop [Maria] and [her] whole family." After Maria responded, "Go ahead. Do it," defendant fired multiple shots into her forehead. Maria fell to the ground.

¶ 12 Noe Jr. came up the steps, saw Maria bleeding, and tried to go back downstairs. Defendant started pushing Noe Jr. and they began fighting for the gun. Defendant struck Noe Jr. in the head with the gun "more than once" until he fell to the ground. Defendant placed his knee on Noe's throat until Noe stopped moving. Defendant then told Ramos to put Maria and Noe's cell phones in his bag. At this point, Rosaura came up the stairs, saw her children dead on the floor, and told defendant she was calling the police. When Rosaura turned around and started walking down the stairs, defendant kicked her in the back, sending her "flying all the way to the bottom." Rosaura landed at the bottom of the stairs, apparently unconscious.

¶ 13 Defendant and Ramos returned to the first floor. Defendant ordered Leonardo and Alexis (who were both minors) to "go look for things that are of value." While Ramos was taking jewelry and cash from the grandparents' room, she heard Rosaura pleading, "No, Diego, why are you slicing my throat?" Defendant then followed Alexis to the basement and Ramos heard Alexis either screaming or laughing. Defendant returned to the first floor without Alexis and told Ramos, "He'll be okay." Ramos went downstairs and saw Alexis lying on the floor in a pool of blood. When Ramos came back upstairs, defendant told her they were leaving. Defendant "cornered" Leonardo on the way out and started "pushing and shoving" him towards the living room fireplace. Ramos grabbed defendant, but he swung a knife at her. Ramos "felt like [she] couldn't do too much after that." As Leonardo yelled, "No, don't do it. I looked at you like a father figure *** I just want to live," defendant stabbed him "[m]ore than twice."

¶ 14    From outside the back door, Ramos saw defendant burning "clothes or something" in the kitchen and noticed he was bleeding from cuts and scratches on his finger, face, and neck. Noe Sr. returned home before Ramos and defendant left. Defendant stabbed Noe Sr. in the back and afterwards told Ramos to mop the floor around Noe Sr. and Rosaura and wipe down the doorknobs. Defendant and Ramos eventually left the house and returned to their own home.

¶ 15    When Noe Jr. did not come to work on February 3rd or 4th, his employer called the police. Upon arriving at the crime scene on February 4, 2016, Chicago Police officers discovered the dead bodies of Maria, Noe Jr., Rosaura. Noe. Sr., Alexis, and Leonardo. Evidence collected during the police investigation included DNA and fingerprint samples and two knives recovered from the basement and rear porch stairwell. Forensic testing revealed that some of the blood recovered from the scene did not match any of the victims' blood.

¶ 16    Detective Nicholas Evangelides interviewed defendant at his home on March 24, 2016. Defendant gave Evangelides his cell phone number and consented to a buccal swab. Forensic testing connected defendant's DNA to blood recovered from the second stair leading to the basement of the house, a support post on the back entrance stairs, and Maria's right-hand fingernails.

¶ 17    Defendant was arrested on May 18, 2016. After being advised of his *Miranda* rights, he admitted shooting Maria, hitting Noe Jr. with a gun twice, kicking Rosaura down the stairs and stabbing her, and stabbing Alexis, Leonardo, and Noe Sr. Defendant claimed he was sorry for what he did.

¶ 18    Dr. Ponni Arunkumar testified that Maria's cause of death was multiple gunshot wounds, and the manner of death was homicide and Noe Jr.'s cause of death was "multiple blunt force and sharp force injuries," and the manner of death was homicide. Dr. Benjamin Soriano testified that Rosaura's cause of death was "multiple sharp force and blunt force injuries," and the manner of

death was homicide and Noe Sr.'s cause of death was "multiple sharp force injuries" and the manner of death was homicide. Dr. Lauren Woertz testified that Leonardo's cause of death was "multiple sharp force injuries" and the manner of death was homicide and Alexis's cause of death was "multiple sharp force injuries" and the manner of death was homicide.

¶ 19        Detectives also collected video surveillance footage from Chicago Transit Authority buses traveling on California Avenue past 5708 South California the evening of February 2, 2016. Surveillance video showed defendant and Ramos arriving at and leaving the house in the same car. Defendant's cell phone records showed activity in the area of 5708 South California on the night of February 2, 2016.

¶ 20                                C. Positive COVID Test

¶ 21        At the close of the State's case, the trial court denied defendant's motion for directed verdict. Before the trial resumed the next day, the court advised the parties that a juror had tested positive for COVID-19 and been excused. The court indicated that, "[a]s a result of [the] positive test," additional safety precautions were being implemented, including: seating jurors farther apart, holding deliberations in the courtroom instead of the jury room, seating the "audience" farther back from the jury, requiring "everyone to keep their mask on at all times unless it's necessary *** to be heard while speaking," and informing the remaining jurors of the situation and encouraging them to get tested for COVID-19.

¶ 22        Defense counsel moved for a mistrial, arguing that the remaining jurors "would not be able to focus on the evidence *** or arguments." Defense counsel also argued: "[W]e don't know if there are jurors that are at high risk that may have complications. We don't know their vaccination status. We don't know if *** they are in contact every day with other people who are high risk *** so we would request that they be *voir dired* for this issue."

¶ 23        The trial court denied defense counsel's motion for mistrial, finding, "No error has been

committed by either party to this trial. The fact that we have to deal with a positive COVID test is something that's caused by factors beyond all of our control." The trial court declined to *voir dire* the remaining jurors. When the jury returned to the courtroom, the court explained the situation and inquired whether any of the jurors had "concerns regarding this issue," noting that "all of the jurors have shaken their head[s] no."

¶ 24     The defense called Jason Fries to testify as an expert in the field of forensic laser scanning. Fries scanned the Martinez home at 5708 South California Avenue and created a three-dimensional model, which included outlines of the bodies recovered at the scene. Fries acknowledged that the diagram did not reveal the number or identity of the offenders or exactly when the murders occurred. The defense rested following Fries's testimony.

¶ 25     At the conclusion of closing arguments, the jury began deliberating in a locked courtroom. On the second day of deliberations, one of the jurors asked the judge if they could continue their deliberations in the jury room instead of the courtroom. The trial judge replied, "[T]he reason we have you spread over the courtroom is because of COVID concerns. If that's not an issue for you and if you prefer the jury room, you can stay in the jury room. But I would need to know that everyone feels comfortable deliberating in the smaller jury room as opposed to the larger courtroom." The jurors confirmed that they were "all okay" with continuing deliberations in the smaller jury room. Later that day, the jury returned a verdict finding the defendant guilty of six counts of first degree murder.

¶ 26                              D. Post Trial

¶ 27     Defendant filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial, arguing, *inter alia*, that the trial court erred in failing to discharge juror Jerry H. for cause and in failing to declare a mistrial when a juror tested positive for COVID-19. The trial court denied the motion and sentenced defendant to a mandatory term of life imprisonment.

¶ 28                                    II. ANALYSIS

¶ 29        On appeal, defendant argues that his "right to an impartial jury was undermined when the court refused to strike a juror for cause" and by the trial court's refusal "to grant the motion for mistrial or, at a minimum, question the jurors as to whether they could reliably deliberate despite being exposed to COVID."

¶ 30        Due process requires " 'a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.' " *People v. Runge*, 234 Ill. 2d 68, 103 (2009) (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)). "The standard for juror impartiality is whether the jurors had such fixed opinions that they could not judge impartially the guilt of the defendant." *Id.* at 103. Trial court determinations of whether to exclude a potential juror for cause or declare a mistrial are reviewed for an abuse of discretion. *People v. Terrell*, 185 Ill. 2d 467, 489 (1998); *People v. Bishop*, 218 Ill. 2d 232, 251 (2006).

¶ 31                              A. For Cause Challenge

¶ 32        Defendant argues that the trial court abused its discretion because Jerry H. "stated repeatedly that he would be biased against" defendant and the trial court "allowed many jurors who expressed a similar reluctance to serve to be excused." The State asserts that the defendant affirmatively waived his objection to Jerry H. by "failing to exercise an available peremptory challenge" to remove him.

¶ 33        "It is well established that the failure of defense counsel to challenge a juror for cause or by peremptory challenge waives any objection to that juror." *People v. Macri*, 185 Ill. 2d 1, 40 (1998); see also *People v. Metcalfe*, 202 Ill. 2d 544, 552-53 (2002) ("There is no question" that a defendant waives his objection to a juror when he fails to "challenge her for cause or to use one of his peremptory challenges to excuse her."). "A court's failure to remove a prospective juror for

cause is grounds for reversal *only if* the defense exercised all of its peremptory challenges and an objectionable juror was allowed to sit on the jury." (Emphasis added.). *People v. Redmond*, 357 Ill. App. 3d 256, 258 (2005).

¶ 34    In *People v. Bowens*, 407 Ill. App. 3d 1094 (2011), the trial court denied the defendant's motion to strike a potential juror, who happened to be the judge's husband, for cause. *Id.* at 1099. The defense failed to use an available peremptory challenge to remove the objectionable juror, who was then seated on the jury. *Id.* The appellate court affirmed, observing that "the law does not permit a party to intentionally fail to avail himself of the resources provided (in this case, peremptory challenges), only to complain about the result on appeal." *Id.* at 1101. The court found that "the defendant's decision not to peremptorily remove [the juror] was an affirmative acquiescence to [his] jury service which thereby constitutes a waiver of this issue on appeal." *Id.* at 1100.

¶ 35    Similarly, as in *Bowens*, "defendant not only failed to exercise a peremptory challenge to remove juror [Jerry H.], he affirmatively accepted the panel" that included Jerry H. *Id.* Defendant's use of two peremptory challenges to strike jurors from the next panel showed that he "understood both the availability of [his] peremptory challenges and how to use them." *Bowens*, 407 Ill. App. 3d at 1100. During the entire jury selection process, defendant only used five peremptories, two fewer than the seven allotted by Supreme Court Rule 434(d). Ill. Sup. Ct. R. 434(d) (eff. May 1, 1985). Under these circumstances, defendant's failure "to use a peremptory challenge on the objectionable juror" is not grounds for reversal. *Redmond*, 357 Ill. App. 3d at 258.

¶ 36    Defendant's reliance on *United States v. Martinez-Salazar*, 528 U.S. 304 (2000), is misplaced. In *Martinez-Salazar*, after examining Federal Rule of Criminal Procedure 24(b), the Supreme Court found that a defendant's use of a peremptory to cure an erroneous refusal to dismiss a potential juror for cause did not deprive the defendant of any "rule-based or constitutional right"

if the defendant was convicted by an impartial jury. *Id.* at 307. The Supreme Court also recognized that individual States' laws may "require a defendant to use a peremptory challenge to strike a juror who should have been removed for cause, in order to preserve the claim that the for-cause ruling impaired the defendant's right to a fair trial." *Id*. at 314 (citing *Ross v. Oklahoma*, 487 U.S. 81, 89 (1988)). The Court did not find these requirements unconstitutional but declined to read a similar rule into federal law. *Id.* at 315.

¶ 37        Since defendant did not peremptorily remove Jerry H. or exhaust his available challenges during jury selection, we are not concerned that the "loss" of a peremptory challenge deprived defendant of a rule-based or constitutional right. *Id.* at 309, 315. On the contrary, defendant actively waived his right to challenge Jerry H. and accepted him as a juror. See *People v. Wilson*, 303 Ill. App. 3d 1035, 1042 (1999) (" 'We have frequently stated that a defendant, having failed to use his peremptory challenges, is in no position to complain concerning jury selections' ") (quoting *People v. Ford*, 19 Ill. 2d 466, 475 (1960)).

¶ 38        Defendant's reliance on *People v. Taylor*, 101 Ill. 2d 377 (1984), is similarly unavailing. In *Taylor*, defendant unsuccessfully challenged five potential jurors for cause. *Id.* at 389. After defendant's peremptory challenges had been exhausted, two of the objectionable jurors were seated on the jury. *Id.* Our supreme court ultimately reversed defendant's convictions, finding that the failure to allow the challenges for cause or grant a change of venue denied defendant a fair trial. *Id.* at 399. Notably, the supreme court's analysis did not address defendant's potential waiver of review. *Taylor* is factually distinguishable from the instant case because, as noted herein, defendant did not use a peremptory to challenge Jerry H. or exhaust his peremptory challenges during jury selection. Accordingly, defendant "is in no position to complain concerning jury selections." *Wilson*, 303 Ill. App. 3d at 1042.

¶ 39                              B. Motion for Mistrial

¶ 40        Defendant also argues that the trial court abused its discretion in denying his motion for a mistrial and refusing to adequately *voir dire* the remaining jurors after dismissing a juror who tested positive for COVID-19. In response, the State asserts that "defendant fails to point to a single instance of possible prejudice in the record that was a result of one juror testing positive for COVID." We agree.

¶ 41        It is within the trial court's discretion to declare a mistrial, but a mistrial should be declared "only as the result of some occurrence at trial of such character and magnitude that the party seeking it is deprived of his right to a fair trial." *People v. Redd*, 135 Ill. 2d 252, 323 (1990). The abuse of discretion standard "recognizes that the trial court has wide discretion in deciding how to handle and respond to allegations of juror bias and misconduct that arise during a trial. *Runge*, 234 Ill. 2d at 105. This discretion "extends to the initial decision of whether to interrogate jurors." *Id.*

¶ 42        Because jury deliberations "take place in the real world, rather than a wholly manageable environment," (*id.*) the Supreme Court recognizes that "due process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). The relevant inquiry is whether "at least some of the jurors have been influenced or prejudiced so that they cannot be fair and impartial." *People v. Williams*, 344 Ill. App. 3d 334, 335 (2003). The party challenging the decision bears the burden of showing that the jurors had a disqualifying state of mind; "mere suspicion" is not enough. *Id.*

¶ 43        Here, after excusing the juror who tested positive for COVID-19, the trial court implemented additional safety precautions. The jurors were also given an opportunity to ask questions and express concerns, which they declined to do. On the second day of deliberations, the jurors told the trial judge they "kind of liked being in" the jury room and confirmed that they were "all okay" with deliberating there instead of in the larger courtroom. The record fails to support

defendant's speculative arguments that "the jurors could *potentially* [have been] unable to concentrate on the remainder of the trial" and that the jurors "possibl[y]" had medical concerns.

¶ 44     Defendant relies on *People v. Walker*, 386 Ill. App. 3d 1025 (2008), *People v. Flores*, 128 Ill. 2d 66 (1989), *People v. Luellen*, 2019 IL App (1st) 172019, and *Runge*, 234 Ill. 2d 68 (2009), to argue that the trial court should have inquired whether the jurors were "comfortable continuing the trial in light of being exposed to COVID-19." We find these cases factually distinguishable from the case at bar.

¶ 45     In *Walker*, defendant alleged that the trial court erred by denying his motion for mistrial "because the jury was prejudiced as a result" of safety concerns one juror had specifically expressed to the other jurors. *Walker*, 386 Ill. App. 3d at 1029. The "court and the parties *** agreed that all of the jurors should be questioned because [the one juror] had related her experience to them." *Id*. at 1028. After individually questioning the jurors, the court denied defendant's motion for mistrial. *Id.* On appeal, the Third District found that "the trial court did not abuse its discretion by denying the defendant's motion for a new trial." *Id.* at 1030.

¶ 46     In *Flores*, defendant argued that "the trial court erred in failing to question the jury following the receipt of a note at trial in which the jurors expressed their apprehension that security in the courtroom was inadequate." *Flores*, 128 Ill. 2d at 97. Defendant alleged that the trial court's remarks to "relieve the jurors' fears" were inadequate. *Id.* at 98. The supreme court found, "no error in the court's not questioning the jurors further," particularly since the jurors had indicated they were no longer concerned. *Id.* at 99.

¶ 47     In *Runge*, after one juror was dismissed for being biased, the remaining jurors were collectively questioned by the trial court and indicated they were still able to comply with the court's instruction to not "arrive at any decisions or conclusions" until hearing all of the evidence. *Runge*, 234 Ill. 2d at 126-28. Our supreme court found the jurors were properly instructed and that

there was no reason to disbelieve the remaining jurors' assertions. *Id.* at 131. The court further found that the trial court did not err in "not conducting a more extensive inquiry or questioning jurors individually before proceeding." *Id.* at 128.

¶ 48        In *Luellen*, "the jury sent the judge three notes expressing fear" for their safety. *Luellen*, 2019 IL App (1st) 172019, ¶ 1. Defendant moved for a mistrial, which the court denied after individually questioning the jurors. *Id.* On appeal, defendant argued that the trial court's "remedial measures were deficient," *i.e.*, not asking "the specific question advocated for by [defendant]'s counsel." *Id.* ¶¶ 39, 41. This court found that "the careful trial judge 'well instructed' the jurors, and nothing in the record or notes suggest[ed] premature discussion of the merits." *Id*. ¶ 41 (quoting *Runge*, 234 Ill. 2d at 131).

¶ 49        Unlike the jurors in *Walker*, *Flores*, *Luellen*, and *Runge*, the jurors in this case *never* expressed any reservations or concerns about continuing to serve after learning that a fellow juror had tested positive for COVID-19. Under these facts and circumstances, the trial court did not abuse its discretion in denying defendant's motion for mistrial and request to *voir dire* the remaining jurors.

¶ 50                        III. CONCLUSION

¶ 51        For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 52        Affirmed.